**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:     January 26, 2020
Date Submitted:   December 2, 2020

Jason C. Powell, Esquire
The Powell Firm, LLC
1201 North Orange Street, Suite 500
P.O. Box 289
Wilmington, DE 19899

David J. Weidman, Esquire
Sergovic Carmean Weidman McCartney & Owens, P.A.
25 Chestnut Street
P.O. Box 751
Georgetown, Delaware 19947

RE:   *In the Matter of 27949 Home Farm Drive, Millsboro, Delaware 19966*
      C.A. No. 2019-0439-PWG

Dear Counsel:

The last stage of a partition proceeding involves the distribution of proceeds from the sale of the partitioned property. This dispute centers around ownership of the property and whether co-owners are entitled to contributions they made towards the cost of the property or an offset related to possession of the property. I

recommend that the Court find that all co-owners have legal and equitable interests in the property and are entitled to contributions for payments made towards the cost of the Property, but not an offset related to possession of the property. This is my final report.

## I.    Background

This is a decree for distribution in a partition action filed by Petitioner Shawn N. Warren ("Petitioner") against Respondents James E. Barbour, Jr. ("James") and Christina Barbour ("Christina") on June 11, 2019 seeking to partition property ("Property") located at 27949 Home Farm Drive, Millsboro, Delaware.[1]

Petitioner and Christina were in a relationship from approximately 1999 until around October of 2018.[2]    According to the recorded deed ("Deed"), Petitioner, Christina and James, Christina's father, purchased the Property, on November 20, 2015, as joint tenants with the right of survivorship.[3]    At settlement, $130,154.50 was paid in cash, along with $195,868.00 from a mortgage loan ("Mortgage Loan") obtained by Christina and James from Flagstar Bank, FSB,

---

[1] Docket Item ("D.I.") 1.  I use first names in pursuit of clarity and intend no familiarity or disrespect.

[2] Trial Tr. 12:19-24; Trial Tr. 35:19-21; Trial Tr. 125:13-15.

[3] D.I. 1, Ex. A.

which was secured by a mortgage ("Mortgage") signed by Petitioner, Christina and James.[4]

Petitioner filed a petition on June 11, 2019 seeking partition of the Property; a declaration that James is not an owner of the property; reimbursement of his $90,000.00 contribution towards the purchase of the Property; reimbursement for Christina's and James' misappropriation of his personal property, and for their exclusive use of the Property; and attorneys' fees and costs.[5] Following a partition hearing on September 13, 2019, the partition order to sell the Property by public auction was entered the same day.[6] The Property was sold at public action on December 16, 2019 for a sale price of $178,000.00, and the Return of Sale was filed on February 18, 2020 and approved by the Court on March 9, 2020.[7]

On August 26, 2020, Petitioner filed a petition for decree for distribution ("Distribution Petition"), asking that all remaining proceeds be awarded to him, and that judgment be entered against James and Christina for any deficiency between the amount awarded and the $90,000.00 he paid towards the purchase of the Property.[8] James and Christina filed an answer and counterclaim to the

---

[4] Pet'r's Trial Ex. 1; *see* Resp't's Trial Ex. 3.

[5] D.I. 1.

[6] D.I. 12; D.I. 13.

[7] D.I. 16, ¶ 9; D.I. 26. The Property was sold to Christina's uncle. Trial Tr. 182:6-8.

[8] D.I. 28.

3

Distribution Petition, on September 4, 2020, and an amended answer and counterclaim, on October 19, 2020, denying that Petitioner contributed $90,000.00 towards the Property's purchase and asking that the remaining sale proceeds be distributed to the parties according to their record title interests.[9] Petitioner responded to the counterclaim,[10] and a hearing on the Distribution Petition was held on December 2, 2020.

## II. Analysis

This is my decision regarding the distribution of the partition sale proceeds among the co-owners. Sale proceeds totaling $67,892.75 remain to be distributed to the co-owners.[11] The parties' claims, including for contributions related to the Property and an offset for rental value benefit, are addressed below.[12]

---

[9] D.I. 31; D.I. 39.

[10] D.I. 46.

[11] D.I. 52. The $179,102.99 due to the sellers at settlement was reduced by $91,074.81 (to pay off the remaining Mortgage Loan obligation), and $6,569.088 (settlement charges), which left $81,459.10 in net proceeds. Net proceeds were reduced by $13,566.56 (Trustee sale costs, including $8,931.65 in auction services, $1,870.20 for other expenses, and $2,764.50 in Trustee's fees). D.I. 21.

[12] Petitioner claims damages for James and Christina's misappropriation of his personal property, as well as the Property's furnishings. D.I. 1, ¶¶ 13, 14. No evidence was provided to support that claim, or to detail the value of his personal property that was taken. Accordingly, I decline to find that James and Christina misappropriated Petitioner's personal property or to award damages.

### A. Ownership interests of the parties

The Deed shows that legal title to the Property is vested in Petitioner, Christina and James, with each owning one-third of the Property as joint tenants with the right of survivorship.[13] Petitioner argues that only he and Christina were intended to be owners of the Property, and that James was only involved to help Christina obtain the Mortgage Loan because of Petitioner's bad credit and Christina's unemployment.[14] James and Christina counter that they are the sole owners of the Property, Petitioner was never intended to be a co-owner, and his inclusion on the Deed was a mistake.[15]

I note the September 13, 2019 partition sale order found that "Petitioner and Respondents are all the co-owners of record of the Property, each owning an equal one-third undivided interest in the whole."[16] Although the parties did not dispute that finding at that time, in the interest of completeness, I will address their claims regarding ownership.

---

[13] D.I. 1, Ex. A. *See generally Foley v. Vari*, 2014 WL 1348138, at *4 (Del. Ch. Apr. 7, 2014), *adopted,* (Del. Ch. 2014); *Inskeep v. Shields*, 4 Del. 345, 346 (Del. Super. 1845) ("[persons] may show that they have acquired a legal title . . . [by a chain] of paper title, that is, by deeds of conveyance to them").

[14] Trial Tr. 13:19-15:1; Trial Tr. 45:23-46:2; Trial Tr. 61:14-22.

[15] Trial Tr. 69:18-22; Trial Tr. 71:14-23; Trial Tr. 128:3-10; Trial Tr. 175:15-177:1.

[16] D.I. 13, ¶ 1. The language stating that the parties' property interests are shared in equal one-thirds is consistent with the language in the proposed partition sale order submitted by Petitioner, and James and Christina's counterclaim to the Distribution

I first consider Petitioner's argument that James was not intended to be a co-owner of the Property. Petitioner is asking the Court to hold that he and Christina have exclusive equitable interest in the Property, even though James is a legal title holder.

Here, James provided valuable consideration towards the purchase of the Property – he and Christina borrowed $195,868.00 to purchase the Property and the evidence shows that most of the Mortgage payments were paid from James and his wife's bank account, and the remainder from the bank account of Christina's sister's partner, on Christina's behalf.[17] James testified that he and Christina paid all Mortgage Loan payments, and Petitioner did not contribute any money towards the Mortgage Loan payments.[18] Petitioner attended the settlement and did not

---

Petition, which asks that remaining sale proceeds be distributed "to the parties as their record title interests in the property appeared by Deed." D.I. 28; D.I. 31; D.I. 39.

[17] The bank records provided at the hearing show monthly payments to Flagstar Bank, FSB, from March of 2016 through July of 2016 and from May of 2017 through December of 2019, from either James' bank account or from the bank account of Christina's sister's partner, on Christina's behalf. Resp't's Trial Ex. 4; Trial Tr. 73:8-74:1. James and Christina testified payments made from Christina's sister's partners' account were made in lieu of payments to Christina by her sister for furniture refurbishment work. Trial Tr. 132:4-11; Trial Tr. 185:6-14.

[18] Trial Tr. 73:22-74:18; Trial Tr. 100:8-12. Petitioner alleges that he gave cash for the monthly mortgage payments to Christina prior to their breakup in October of 2018, although there was no documentation to support his claim. Trial Tr. 47:7-18; Trial Tr. 48:16-18; Trial Tr. 49:5-17. There were three instances (on May 15, 2017, February 27, 2018, and April 2, 2018) that bank records show deposits made to James' account in close to the amount of the Mortgage Loan payment near the time when the monthly

6

object when James' name was placed on the Deed.[19] Further, I find James' testimony credible that he and his wife moved into the Property on or around February of 2016.[20] I conclude James has both an equitable and legal interest in the Property.

Next, I consider James and Christina's argument that Petitioner was not intended to be a co-owner, and his inclusion on the deed and his signing of documents related to the Property's purchase were mistakes.[21] They contend that Petitioner, although a legal title holder to the Property, does not have an equitable interest in the Property. James and Christina both testified that James was not intended to be a co-owner of the Property.[22] Christina testified that all of the documents related to settlement which included Petitioner as a co-owner were mistakes, while James thought Petitioner was signing as a witness.[23] They do not dispute that money coming from Petitioner's annuity benefit was paid toward the

---

Mortgage Loan payment was made. Resp't's Trial Ex. 4. However, there was no evidence to tie those deposits to money provided by Petitioner. Accordingly, I find there is not sufficient evidence to support Petitioner's claim.

[19] Trial Tr. 46:3-11; Trial Tr. 71:9-11.

[20] Trial Tr. 67:17-20. James sold the property that he had previously lived in after he moved into the Property. Trial Tr. 68:5-69:1; Trial Tr. 92:15-16.

[21] Trial Tr. 69:18-22; Trial Tr. 128:3-10.

[22] Trial Tr. 69:21-22; Trial Tr. 129:15-22.

[23] Trial Tr. 71:21-23; Trial Tr. 175:1-177:1.

purchase of the Property, but view that money as repayment to Christina for her long-standing financial support of Petitioner.[24]

Here, the evidence does not support James and Christina's claim. Petitioner was included as a co-owner on the Deed and on the Mortgage, and signed the Mortgage and the FHA Planned Unit Development Rider associated with the Mortgage.[25] In addition, at settlement, Petitioner executed a non-applicant affidavit pledging his interest in the Property to secure the Mortgage Loan.[26] The settlement documents containing Petitioner's name were prepared in advance, with his name being typed into the documents.[27] His ownership interest was also reflected in the application for the Mortgage Loan, which would have been submitted by Christina and James in advance of settlement.[28] And, James and Christina did not object to Petitioner's inclusion on the Deed.[29] In fact, the first time there was any mention of Petitioner's mistaken inclusion on the Deed was at the December 2, 2020 hearing. In addition, the evidence demonstrates that Petitioner contributed funds from his annuity benefit, totaling $89,583.51, towards

---

[24] Trial Tr. 77:1-4; Trial Tr. 77:11-17; Trial Tr. 86:1-3; Trial Tr. 109:4-7; Trial Tr. 132:17-133:3; Trial Tr. 134:15-135:1; Trial Tr. 137:4-138:13.

[25] *See* Resp't's Trial Ex. 2.

[26] Pet'r's Trial Ex. 3; Trial Tr. 32:14-20.

[27] *See* Resp't's Trial Exs. 1, 2; Pet'r's Trial Ex. 3.

[28] The Mortgage Loan application indicates that title to the Property will be held in Christina's, James' and Petitioner's names. Pet'r's Trial Ex. 12.

the purchase of the Property.[30]  Accordingly, I find that Petitioner was intended to be a co-owner and has both a legal and equitable interest in the Property.

### B.  Contributions toward the Property's Purchase Costs

Petitioner asks that all remaining sale proceeds be awarded to him, and judgment be entered against James and Christina for any deficiency between the amount awarded and the $90,000.00 he paid towards the purchase of the Property.[31]  James and Christina deny that Petitioner contributed $90,000.00 towards the Property's purchase and ask that sale proceeds be distributed according to the co-owners' one-third interest in the Property.[32]  Pursuant to the Deed, Petitioner, James and Christina each owned a one-third share of the Property.[33] The issue is whether the amounts paid towards the purchase price, based upon an agreement of the parties about the financial arrangement, equitably affect the amount of sale proceeds each co-owner receives.

Petitioner claims that he provided $130,154.50 in cash at settlement, including $89,583.51 from his work annuity benefit, an additional $10,416.49 from Petitioner and Christina's joint money market account ("MM Account"), and

---

[29] Trial Tr. 46:6-11.

[30] *See* n. 35 *infra.*

[31] D.I. 28.

[32] D.I. 39.

[33] D.I. 1, Ex. A.

$26,409.30 from their joint checking account ("Checking Account"), which was funded by his income because Christina did not work.[34] $89,583.51 was placed in the MM Account in October of 2014 from Petitioner's annuity funds. There were no withdrawals from that account until $100,000.00 was withdrawn on November 20, 2015, the settlement date for the Property.[35] I find $89,583.51 from Petitioner's work annuity benefit is directly attributable to the cash payment to purchase the Property.[36] However, I cannot attribute the remaining cash funds paid at settlement solely to Petitioner. There is no documentation to support that

---

[34] Trial Tr. 16:20-24; Trial Tr. 23:8-15.

[35] Trial Tr. 17:15-23. Petitioner received $66,400.62 from his Ironworkers Local 16 Annuity Benefit on October 14, 2014, and deposited that money into the MM Account on October 20, 2014. Pet'r's Trial Ex. 2; Resp't's Trial Ex. 6. Petitioner received an additional $23,182.89 from his Ironworkers Local 16 Annuity Benefit on October 14, 2014, which he deposited into the MM Account on October 17, 2014. Pet'r's Trial Ex. 4; Resp't's Trial Ex. 6. The balance in the MM Account was $96,684.51 as of October 27, 2014. Other than a $3,293.98 transfer from the Checking Account on December 29, 2014 and interest payments, there were no changes to the MM Account until November 20, 2015, when $1,000.00 was transferred into that Account from the Checking Account and $100,000.00 was withdrawn on the same day that settlement occurred on the Property. *See* Resp't's Trial Ex. 6.

[36] Although James testified that "at least half" of the cash at settlement came from cash gifts he provided to Christina over the years, he offered no documentation to support his claim. Trial Tr. 86:8-16; Trial Tr. 109:4-11; Trial Tr. 110:2-111:15. In addition, James and Christina contend that any money Petitioner claims he contributed towards the Property belonged to Christina because she financially supported him. Trial Tr. 77:11-17; Trial Tr. 134:15-23; Trial Tr. 148:14-149:3. However, there is no proof that Christina financially supported Petitioner; in contrast, the evidence shows that Petitioner deposited income, including direct deposits from his job, into the Checking Account which was used for the couple's joint benefit. Trial Tr. 23:9-15; Trial 25:3-10. *See* Resp't's Trial Ex. 5.

10

claim and there is contradictory testimony about the source of the additional funding.

In addition, James and Christina took out a Mortgage Loan in the amount of $195,868.00 in order to purchase the Property.[37] Petitioner testified that James and Christina took out the Mortgage Loan because he "came to the table with money."[38] When the Property sold in February of 2020, $91,074.81 remained to be paid on the Mortgage Loan.[39] So, James and Christina paid $104,793.19 towards the Mortgage Loan.[40]

I find that the co-owners' financial agreement about the Property is demonstrated through their obligations at the time of purchase, with Petitioner providing $89,583.51 in cash, James and Christina taking out the $195,868.00 Mortgage Loan, and the remaining cash at settlement coming from funds not clearly attributable to particular co-owner(s). Because $91,074.81 remained to be paid on the Mortgage Loan when the Property was sold, James and Christina contributed $104,793.19 toward the Mortgage Loan and only partially fulfilled their obligations under the agreement.[41]

---

[37] Resp't's Trial Exs. 2, 3; Pet'r's Trial Ex. 1.

[38] Trial Tr. 30:13-16.

[39] Resp't's Trial Ex. 7; Trial Tr. 78:6-23; Trial Tr.115:15-21.

[40] Trial Tr. 78:12-23; Trial Tr. 146:2-4.

[41] Resp't's Trial Ex. 7.

Accordingly, it is equitable that each co-owner's share of the sale proceeds reflect their comparative direct contributions, consistent with the parties' financial agreement for purchasing the Property. James and Christina together contributed $104,793.19 towards the Mortgage Loan, or $52,396.60 each, and Petitioner provided $89,583.51. I find Petitioner paid 46% of the total contributions of the parties towards the cost of the Property, and James and Christina each contributed 27% of the total contributions share of the sale, or 54% combined.[42]

## C.    Petitioner's claim for rental value benefit for the Property

Petitioner asks that James and Christina's share of the sale proceeds be offset for the fair rental value of the Property, claiming they ousted him during the time they lived in the Property.[43]

"[E]ach co-tenant is entitled to the possession of the property, [and] the mere fact that one is in possession and the other is not 'does not presumptively show an

---

[42] The proportional shares are calculated based upon total contributions of $194,376.70, including Petitioner's $89,583.51 cash payment and $104,793.19 paid by James and Christina on the Mortgage Loan. The remaining funds used to purchase the Property cannot be attributed to a particular party but appear to have come from commingled funds.

[43] *See* Trial Tr. 213:11-214:3. Petitioner argues that the fair monthly rental value for the Property would be $1,750.00 and relies on realtor.com's rental estimate for the Property. Pet'r's Trial Ex. 10. *See also* Trial Tr. 214:1-3.

ouster.'"[44] "A cotenant is generally entitled to make personal use of the property held in common and is not accountable for such use in the absence of ouster."[45] And, a co-owner residing in the jointly owned property has no obligation to pay rent unless the co-owners agreed that rent would be paid.[46] "However, if a co-tenant has exclusive possession of the property and ousts other co-tenants, then the rental value (representing the benefit received by the co-tenant having exclusive possession) may be set off against their share of the sale proceeds."[47]

The first question is whether Petitioner was ousted from the Property. Petitioner testified that no one lived in the Property after its purchase until he and Christina ended their relationship in 2018.[48] In contrast, James claims he moved into the Property on or around February of 2016 and has remained in the Property since that time.[49] Christina moved in to the Property with her parents when she

---

[44] *Smith v. Lemp,* 63 A.2d 169, 170 (Del. Ch. 1949) (citations omitted). *Knight v. Knight* 89 A. 595, 596 (Del. Ch. 1914) ("the possession of one [co-owner] is the possession of the other).

[45] *In re Estate of Gedling,* 2000 WL 567879, at *7 (Del. Ch. Feb. 29, 2000) (citations omitted).

[46] *Id.*, at *13 ("As a co-owner, she has no obligation to pay rent.); *see generally Fuqua v. Fuqua*, 750 S.W.2d 238, 246 (Tex. App. 1988) *writ denied* (Sept. 28, 1988).

[47] *Ponder v. Willey*, 2020 WL 6735715, at *3 (Del. Ch. Nov. 17, 2020), *report and recommendation adopted* (Del. Ch. 2020).

[48] Trial Tr. 58:7-15; Trial Tr. 59:20-21. Petitioner alleges he wanted to move to the Property but held off because Christina wanted to delay moving in until it was furnished. Trial Tr. 57:12-23.

[49] Trial Tr. 67:17-23.

and Petitioner split up and continues to live there.[50]  It is undisputed that Petitioner never lived in the house.[51]

Petitioner asserts he was denied access to the Property when James and Christina changed the locks.[52]  James and Christina dispute that the locks were changed.[53]  As co-owners, James and Christina had a right to live in and use the Property.  Although Petitioner may not have lived in the Property, the evidence does not show that he was ousted from it.  There is no evidence that Petitioner attempted, or asked, to enter onto the Property and was excluded access by James or Christina.  In addition, Petitioner did not ask for rent (prior to this action), nor did James and Christina agree to pay rent.[54]  Since no ouster has been shown and James and Christina have no obligation to pay rent, no rental value benefit is set off against their share of the sale proceeds.

---

[50] Trial Tr. 34:9-21; Trial Tr. 67:24-68:1; Trial Tr. 127:4-6.

[51] Trial Tr. 34:22-24; Trial Tr. 60:4-6; Trial Tr. 68:4.

[52] D.I. 1, ¶ 4; Trial Tr. 35:1-35:5.

[53] Trial Tr. 120:23-121:9.

[54] James and Christina testified that they did not pay Petitioner rent for their use of the Property and felt no obligation to do so. Trial Tr. 35:6-9; Trial Tr. 108:12-17; Trial Tr. 183:22-184:11.

### D.    Attorneys' fees and costs

Petitioner has requested reimbursement of his attorney's fees from the partition sale proceeds.[55]  "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[56]  Equitable exceptions to the American Rule include the bad faith exception,[57] and the "common benefit doctrine."[58]  Here, I find no basis to shift Petitioner's attorneys' fees and costs to James or Christina. There is no evidence of bad faith conduct on the part of James or Christina, or that Petitioner's efforts to partition the Property produced a benefit that would not otherwise have existed.[59]  Therefore, Petitioner's claim for attorneys' fees and costs is denied and he must bear his own attorneys' fees and costs.

---

[55] D.I. 1.

[56] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017); *see also Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014).

[57] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."  *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

[58] "The common benefit doctrine . . . is designed to equitably spread the costs of producing a benefit realized by a group, which benefit, absent the Plaintiff's efforts, *would not exist*." *Moore v. Davis*, 2011 WL 3890534, at *2 (Del. Ch. Aug. 29, 2011).

[59] Courts have found that partition sales result "in the co-tenants exchanging an asset of equal value, i.e., the co-tenants exchange an undivided fractional ownership in the property for a corresponding fractional interest in the net value of the property upon sale.

## III.  Conclusion

For the reasons set forth above, I recommend the Court find that the remaining sale proceeds in the amount of $67,892.75 should be distributed as follows: Petitioner is entitled to receive 46% percent of the remaining sale proceeds, or $31,230.67, James is entitled to receive 27% of the sale proceeds, or $18,331.04, and Christina is entitled to 27% of the sale proceeds, or $18,331.04. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

<div style="margin-left:auto">

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

</div>

---

The result is a wash and, therefore, no benefit to the group results from a petitioner's actions in a typical partition case." *Estate of Proffitt v. Miles*, 2012 WL 3542202, at *2 (Del. Ch. Aug. 4, 2012); *see also Moore*, 2011 WL 3890534, at *2.