IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PHILIP R. SHAWE, | § | |
| | § | No. 487, 2016 |
| Plaintiff/Respondent | § | |
| Below-Appellant, | § | Court Below—Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. Nos. 9661, 9686, |
| ELIZABETH ELTING, | § | 9700, 10449 |
| | § | |
| Defendant/Petitioner | § | |
| Below-Appellee. | § | |

Submitted: January 18, 2017
Decided: February 13, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon Appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**.

Peter B. Ladig, Esquire, Morris James LLP, Wilmington, Delaware; David B. Goldstein, Esquire, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, New York for Plaintiff/Respondent, Appellant, Philip R. Shawe.

Kevin R. Shannon, Esquire, Berton W. Ashman, Jr., Esquire, Christopher N. Kelly, Esquire, Jaclyn C. Levy, Esquire, and Mathew A. Golden, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Eric Alan Stone, Esquire, Robert A. Atkins, Esquire, and Gerard E. Harper, Esquire, Paul, Weiss, Rifkand, Wharton & Garrison LLP, New York, New York; Philip S. Kaufman, Esquire, Ronald S. Greenberg, Esquire, Marjorie E. Sheldon, Esquire, and Jared I. Heller, Esquire, Kramer Levin Naftalis & Frankel LLP, New York, New York for Defendant/Petitioner, Appellee, Elizabeth Elting.

**SEITZ**, Justice:

Philip Shawe appeals an order of the Court of Chancery sanctioning him for misconduct throughout litigation with his current business partner and former romantic partner, Elizabeth Elting. After an evidentiary hearing, the Court of Chancery found that Shawe deleted documents from his computer, recklessly failed to safeguard his cell phone, improperly gained access to Elting's e-mails, and lied multiple times under oath. The court also found that Shawe's improper conduct impeded the administration of justice, unduly complicated the proceedings, and caused the court to make false factual findings. The Court of Chancery ordered Shawe to pay 100% of the fees Elting incurred in connection with bringing the motion for sanctions, and 33% of the fees she incurred litigating the merits of the case, awarding Elting a total of $7,103,755 in fees and expenses.

On appeal, Shawe argues that the Court of Chancery erred in three respects: (1) by finding that he acted in bad faith when he deleted the files from his laptop and failed to safeguard his cell phone; (2) for failing to afford him criminal due process protections before sanctioning him for "perjury"; and (3) by awarding Elting an excessive fee. After a careful review of the record, we find that the Court of Chancery followed the correct legal standards and made no errors of law in its sanctions ruling. Shawe's behavior was "unusually deplorable,"[1] and thus the

---

[1] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *13 (Del. Ch. July 20, 2016).

Court of Chancery acted well within its discretion by sanctioning him for his bad faith conduct. We therefore affirm the judgment of the Court of Chancery.

## I.

In a companion opinion issued today, the Court has set forth the long history of personal and business conflicts between Shawe and Elting as the co-founders and co-CEOs of Transperfect Global, Inc. ("TPG"). We assume familiarity with those facts, and in this decision set forth only the facts necessary to decide the appeal from the sanctions order.

### A. Tensions Rise

In October 2013, Elting hired Kramer Levin Naftalis & Frankel LLP to try to resolve the various disputes between Shawe and her. Shawe became enraged by this and began spying on Elting. He directed employees to intercept Elting's mail and to monitor her phone calls. Then, in December 2013, Shawe began monitoring Elting's personal e-mails.

At first, Shawe falsely claimed that he, working alone, took Elting's computer and removed her hard drive so he could read her e-mails. In reality, Shawe broke into Elting's office on December 31, 2013 and brought her computer to Michael Wudke, then-President of TPG's forensic technology business. Wudke imaged Elting's hard drive by removing it from the computer and connecting it to a

3

forensic "Tableau device" with a "write blocker," to conceal what he had done.[2] After imaging the drive, Wudke restored it, and Shawe brought the computer back to Elting's office. Wudke then exported Elting's e-mail files onto an external device so that Shawe would have a copy. Wudke helped Shawe download Elting's e-mails on at least two other occasions in 2014 in substantially the same fashion. Shawe instructed Wudke not to document his actions. As explained further below, Shawe concealed Wudke's role until November 2015.

Shawe also remotely accessed Elting's computer at least forty-four times on twenty-nine different occasions. He did this by using a "map" to gain access to Elting's computer using the TPG shared drive. Because Shawe had the proper administrative permissions, he was able to access her computer remotely through the shared drive.[3] The majority of these instances occurred in the late evening and early morning hours. He gained access to approximately 19,000 of Elting's e-mails, including approximately 12,000 privileged communications between her and her counsel.

---

[2] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *2.
[3] App. to Answering Br. at 1161-62:
> A computer user can "map" on his computer to use a shared drive on another system to which the computer is connected and for which the user has the correct permissions. Mapping a drive can make it easier for a user to quickly access files or run programs on a shared drive. With the proper permissions or rights, such as sufficient "administrator" rights, the user can navigate through the folders on the mapped drive and has complete access to all files on the mapped drive as granted based on the user's permissions to that mapped drive and computer.

### B. Nathan Richards Hired As Shawe's "Paralegal"

On April 1, 2014, Nathan Richards, a former TPG employee, met with Shawe in New York. Richards believed he was being summoned for a marketing assignment. Instead, Shawe hired Richards as his personal "paralegal," though Richards had no experience in such a role. Shawe paid him $250,000—almost twice his previous high salary—for his services. Throughout his tenure, Richards broke into Elting's office in the early hours of the morning to take photographs and remove hard copies of documents.

### C. Litigation Begins

Over the ensuing months, relations between Shawe and Elting deteriorated even further, and it became abundantly clear that litigation was imminent. Thus, on April 11, 2014, Shawe distributed a litigation hold notice to senior management and other TPG employees.

In May 2014, Shawe and Elting filed four separate lawsuits against each other, one in New York and three in the Court of Chancery. The Delaware suits dealt with Elting's petition for dissolution of TPG and the associated LLC (Shawe's and Elting's asset protection and distribution vehicle) and Shawe's claimed fiduciary violations against Elting. On September 3, 2014, Elting served Shawe with document requests and sent out a second, similar litigation hold notice to TPG personnel.

In November 2014, shortly after the Court of Chancery ordered an expedited trial on the parties' claims, Shawe revealed that he had been reading Elting's personal e-mails, including privileged communications between Elting and her counsel. The court thus ordered expedited discovery for a possible sanctions motion.

**D. The Cell Phone**

Despite the two litigation hold notices and specialized knowledge as the CEO of a company whose expertise is in document preservation and production, Shawe did not preserve his cell phone or laptop.

On November 22, 2014, just four days after the Court ordered an expedited trial, Shawe's cell phone was allegedly damaged by his niece. According to Shawe, while he and his brother were in the other room, his niece dropped the phone in a plastic cup of Diet Coke. Shawe tried to revive it by drying it and charging it, but was unsuccessful. The next week, he gave his phone to his assistant, Joe Campbell, to try and fix it. Shawe did not remind Campbell about his need to preserve the phone due to the litigation hold notices or outstanding discovery requests. Campbell's only qualification for the task was that his own phone fell into a toilet once and it worked after he let it dry.

Campbell made modest (unsuccessful) efforts to revive the phone and eventually put it in a desk drawer in his office. According to Campbell, sometime

in December 2014, he opened the drawer containing Shawe's phone and noticed rat droppings in the drawer. In a "visceral reaction," he tossed the contents of the drawer including the phone into the garbage. Campbell had been a paralegal for five years and had received both litigation hold notices. The Court of Chancery found this story "bizarre" and incredible.[4] So do we.

### E. Shawe Reveals He Has Been Reading Elting's E-mails

Three days after the "Diet Coke" incident, Shawe sought a declaration by a New York court that the e-mails Shawe accessed were not privileged. Until then, Elting had not known that Shawe had been accessing her personal e-mails. Based on the new information, Elting moved for expedited discovery to aid her in a motion for sanctions. The court granted the motion, finding that "expediting discovery was urgently necessary to protect Elting's rights and the integrity of these proceedings and related actions."[5]

### F. The December 2014 Deletions

After the Court of Chancery ordered expedited discovery, Shawe continued to use his personal laptop. He made an image of the laptop on December 20, 2014 (the "December 20 Image") but deleted 18,970 files the day before doing so. He deleted files by sending them to the "recycle bin" folder and then emptying the

---

[4] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *5.
[5] *Id*. (internal citation omitted).

recycle bin. Shawe did not regularly empty his recycle bin, and as of December 19, 2014, forensic evidence showed that he had files dating back to August 2014 in his recycle bin. Shawe also cleared his temporary internet files, browser history, and temporary files created by application software, which included evidence of his use of a program to view Elting's e-mails. Unbeknownst to Shawe, his operating system created volume shadow copies on December 8, 12, 16, and 19. As a result, all but 1,068 of the e-mails were recovered. With Wudke's assistance, Shawe deleted another 22,000 e-mails on December 22. Wudke used a specialty software program to permanently erase the files from the computer. As explained below, Shawe lied for nearly a year about Wudke's involvement and, instead, blamed the deletions on Richards.

It was not until late December 2014 when Shawe's own expert determined that files had been deleted from Shawe's laptop. On January 9, 2015 the expert reported his findings to Shawe's counsel. On January 12, Shawe flew to San Diego to hand deliver to his expert the December 20 Image. On January 16, Shawe's "professional responsibility counsel," Ronald Minkoff, sent Elting's counsel a letter disclosing the deletions, stating that Shawe had asked an "assistant" to make a full forensic copy of his laptop and to then delete certain files. The letter did not list the identity of the "assistant." Shawe had retained

Minkoff to serve as his special counsel to advise him on various ethical issues, including his use of Elting's e-mails.

### G. False Interrogatory and Deposition Responses

Shawe was scheduled to be deposed on January 20, 2015 about the e-mail issues. The night before the deposition, Shawe submitted amended responses to interrogatories from Elting. The Court of Chancery found the following concerns with his interrogatory responses:

- Interrogatory No. 5 asked Shawe to describe each instance in which he had accessed Elting's hard drive. Shawe referenced only the 2013 incident and omitted the other occasions.

- Interrogatory No. 17 asked Shawe to identify anyone who may have had knowledge about his downloading and exporting Elting's personal e-mail files. Shawe listed twenty-seven people, yet did not identify Wudke.

- Interrogatories 20, 21, and 23 asked Shawe to identify persons with knowledge of, or who may have assisted him in accessing or reviewing documents on Elting's hard drive. Shawe swore that no one other than his counsel had information about his accessing or reviewing information on the hard drive, and that no one assisted him in downloading or accessing Elting's personal e-mails.

9

Shawe appeared for deposition the next day. He testified that on New Year's Eve, he personally imaged Elting's hard drive and exported the files himself. He identified the "assistant" from Minkoff's January 16 letter as Richards, and said that Richards made a mirror image copy and deleted only files that contained personal, privileged, or medical documents.

The court found that it was "convenient" for Shawe to finger Richards as his accomplice because Shawe knew that Richards was quitting his job and moving back to Washington.[6] The court held that Shawe used Richards as a "scapegoat" because he knew it would be difficult to track him down before the rapidly approaching trial.[7]

**H. False Trial Testimony And False Affidavit During Post-Trial Briefing**

Trial began on February 23, 2015. On the third day, Shawe once again falsely testified that it was Richards who made the December 20 Image and deleted the files on his laptop. He also said he did not know how the December 20 Image was made, or which files had supposedly been deleted.

On April 3, 2015, in connection with post-trial briefing, Shawe submitted an affidavit where he again insisted that Richards made the December 20 Image and

---

[6] *Id*. at *8.
[7] *Id*.

deleted the files from his laptop. The affidavit also said that Campbell "misplaced" the cell phone, omitting the fact that Campbell had thrown it out.

## I.  The Merits Opinion And The Sanctions Hearing

The Court of Chancery issued the Merits Opinion on August 13, 2015, and ordered a hearing on Elting's motion for sanctions for January 7-8, 2016.

On November 25, 2015, a newly retained Shawe attorney e-mailed Elting's counsel to add Wudke to Shawe's previously exchanged witness list. The e-mail stated that counsel had just learned that Wudke, not Richards, made the December 20 Image of Shawe's laptop. The disclosure prompted Wudke's deposition, during which the extent of his involvement was revealed.

On July 20, 2016, the Court of Chancery granted Elting's motion for sanctions. The court held that Shawe engaged in bad faith:

> (1) by intentionally attempting to destroy information on his laptop computer after the Court had entered an order requiring him to provide the laptop for forensic discovery, (2) by, at a minimum, recklessly failing to safeguard evidence on his phone, which he regularly used to exchange text messages with employees and which was an important source for discovery, and (3) by repeatedly lying under oath to conceal aspects of his secret extraction of information from Elting's hard drive and the deletion of information from his laptop.[8]

---

[8] *Id*. at *13.

11

The court determined that Shawe's behavior caused delays, confusion, and even led the court to make false findings.[9] Thus, the court found fee shifting was an appropriate remedy.[10] Based on the court's "deep familiarity with the twists and turns of the case,"[11] it ordered Shawe to pay 100% of the fees Elting incurred in connection with bringing the motion for sanctions and 33% of the fees she incurred from litigating the merits of the case. Elting's counsel submitted supporting materials regarding their fees. On August 19, 2016, the court entered a final order and judgment, awarding Elting a total of $6,519,471 in attorneys' fees and $584,284 in expenses, and ordering Shawe to pay the total amount ($7,103,755) within ten business days. This appeal followed.

## II.

On appeal, Shawe argues that the Court of Chancery erred in three respects: (1) Shawe did not act in bad faith by deleting the files from his laptop and failing to safeguard his phone, and thus the court's sanction was improper; (2) the court

---

[9] The Merits Opinion mistakenly names Richards instead of Wudke as a participant in the December 2014 deletions.

[10] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *18:

> These actions had the effect of obstructing the administration of justice, prejudiced Elting's ability to fully develop the record at the Merits Trial, and protracted the proceedings. They also had another pernicious effect. As noted above, Shawe's false testimony misled the Court and caused Richards to be identified mistakenly in the Merits Opinion as a participant in the December 22 deletions to Shawe's laptop. Richards credibly testified that he was "horrified" when he saw this.

[11] *Id*. at *19.

should have afforded him criminal due process protections before sanctioning him for perjury; and (3) the court's fee award was excessive. For purposes of our review, we will not disturb the Court of Chancery's decision to impose fee-shifting[12] and spoliation[13] sanctions absent an abuse of discretion. "To the extent a decision to impose sanctions is factually based, we accept the trial court's factual findings so long as they are sufficiently supported by the record, are the product of an orderly and logical reasoning process, and are not clearly erroneous."[14] We review questions of law and claimed constitutional violations *de novo*.[15]

**A.**

Shawe first argues that the Court of Chancery erred by finding that he acted in bad faith by deleting files from his laptop and failing to safeguard his cell phone. Specifically, Shawe argues that no evidence was lost because the laptop and the December 20 Image were eventually produced, and thus the court erred by finding he acted in bad faith.

Delaware follows the "American Rule," which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the

---

[12] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015).
[13] *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 190 (Del. 2011).
[14] *Id.*
[15] *Stanford v. State Merit Emp. Relations Bd.*, 44 A.3d 923, 2012 WL 1549811, at *3 (Del. May 1, 2012) (TABLE).

13

litigation.[16] There are, however, several recognized exceptions to the rule, such as the bad faith exception.[17] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims."[18] Courts have also found bad faith where a party misled the court, altered testimony, or changed his position on an issue.[19] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[20] The party seeking fees must demonstrate by clear evidence that the other party acted in subjective bad faith.[21]

Shawe argues that because Elting was not prejudiced by his misconduct, the court was without power to sanction him. There is no requirement that Shawe succeed in his efforts to thwart Elting's ability to prosecute the merits of the case for the Court of Chancery to have the power to sanction him.[22] Even so, as the Court of Chancery held, the deletion of the files from Shawe's laptop "prejudiced

---

[16] *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).
[17] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).
[18] *Id.* at 546.
[19] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005).
[20] *Montgomery Cellular*, 880 A.2d at 227.
[21] *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014).
[22] *See Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (Court properly sanctioned defendant who engaged in "abusive litigation tactics" by repeatedly postponing his appearance at depositions, refusing to answer questions when he finally appeared, and his attorney did not respond to interrogatories or requests for production).

Elting's ability to litigate effectively," by preventing her from accessing the information on the laptop until shortly before trial.[23]

Shawe deleted 41,000 files from his laptop in December 2014 in the face of two litigation hold notices, one of which he issued, and an expedited discovery order that permitted Elting to conduct forensic discovery of Shawe's laptop. Although these files were ultimately recovered—except 1,068 that were unrecoverable—the court held "that the intended purpose of Shawe's actions was to make information unavailable for the required forensic discovery in direct contravention of the Expedited Discovery Order," and that Shawe would have succeeded but for "the fortuity of the laptop's volume shadow copy system and [his expert's] intervention—but that does not negate his illicit intent."[24] Thus, it was a proper exercise of the Court of Chancery's discretion to sanction Shawe for his intentional misconduct.

**B.**

Shawe next argues that Elting did not prove that the evidence on his cell phone was relevant to the Merits Trial, and thus the Court of Chancery should not have sanctioned him for recklessly failing to preserve his text messages.

---

[23] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *15.
[24] *Id*. at *13, *19.

15

A party in litigation has an affirmative duty to preserve potentially relevant evidence.[25] A court may sanction a party who "destroy[s] relevant evidence" or "fail[s] to prevent the destruction of such evidence."[26] "A party is not obligated to 'preserve every shred of paper, every e-mail or electronic document, but instead must preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.'"[27] "To impose monetary sanctions, [a court] need only find that a party had a duty to preserve evidence and breached that duty."[28]

As the Court of Chancery held, in the face of two litigation hold notices and an outstanding discovery request, Shawe's "failure to safeguard evidence from his iPhone, an important source of discovery given his frequent use of text messages, by not safeguarding it in the first place and by turning the allegedly damaged phone over to a subordinate under his firm control who was not competent to recover information from it was, at a minimum, reckless, and potentially much

---

[25] *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009).
[26] *Id.*
[27] *Seibold v. Camulos Partners LP*, 2012 WL 4076182, at *23 (Del. Ch. Sept. 17, 2012) (quoting *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011)).
[28] *Beard Research*, 981 A.2d at 1194.

worse."[29]  Further, instead of immediately disclosing that Campbell had thrown out

his phone, he hid the truth until Campbell was deposed a year later.

> The Court of Chancery found that the text messages:

> [W]ere an important source of discovery that were reasonably
> calculated to yield information relevant to the Merits Trial, such as
> evidence of deadlocks between the Company's co-CEOs and the bias
> of witnesses who testified on Shawe's behalf.  Indeed, many text
> messages retrieved from Shawe's *next* phone provided relevant
> evidence at the Merits Trial.[30]

Contrary to Shawe's contention that there is no evidence to support this finding,

the court relied on texts from Shawe's replacement phone in the Merits Opinion.[31]

Thus, the Court of Chancery was well within its discretion to sanction Shawe for

his litigation misconduct.

## C.

Shawe also argues that the Court of Chancery punished him criminally for

perjury without due process protections by sanctioning him for his continuous lies

under oath.  He argues that the sanction hearing was limited to eight particularized

grounds, and perjury was not one of them.

While Shawe's conduct may have constituted perjury, the court did not

charge or convict him of perjury.  Rather, the court imposed a civil sanction

---

[29] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *19.
[30] *Id*. at *16 (emphasis in original).
[31] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *23.

17

against him for his repeated lies under oath in interrogatory responses, at deposition, at trial, and in a post-trial affidavit to cover up what he had done. Shawe's falsehoods wasted the court's time, needlessly complicated and expanded the proceedings, and caused the court to find erroneous facts in its Merits Opinion. The Court of Chancery thus acted well within its discretion to sanction him for lying during the litigation.[32]

## D.

Shawe next argues that the Court of Chancery's award of attorneys' fees was excessive because (1) Elting did not prevail on all of the grounds alleged in her motion for sanctions; (2) Elting did not "submit a shred of evidence of how she incurred additional fees on the Merits by the limited misconduct found, and the court cited no evidence justifying as compensatory any part of the Merits Fees"[33]; (3) Shawe prevailed on several claims on the merits; and (4) Elting would have incurred the same expenses litigating the merits of the dispute regardless of Shawe's misconduct. He also argues that because the fees were punitive and not compensatory, he was entitled to criminal due process protections.

The Court of Chancery awarded Elting all of her attorneys' fees related to the litigation of the sanctions motion. It also held that:

---

[32] *See Choupak v. Rivkin*, 2015 WL 1589610, at *22-23 (Del. Ch. Apr. 6, 2015) *aff'd*, 129 A.3d 232, 2015 WL 8483702 (Del. Dec. 4, 2015) (TABLE).
[33] Opening Br. at 55.

18

An additional amount is appropriate because Shawe's bad-faith misconduct significantly complicated and permeated the litigation of the Merits Trial, from at least December 2, 2014, the date on which Elting sought expedited discovery in aid of her later-filed Sanctions Motion, until its conclusion. For that period, an appropriate sanction is to shift to Shawe a reasonable percentage of the attorneys' fees and expenses Elting incurred in connection with the Merits Trial because Shawe's misconduct unduly complicated and drove up the costs of that proceeding. Based on my deep familiarity with the twists and turns of this case, 33% is a reasonable approximation to compensate Elting fairly for that time period.[34]

The Court of Chancery has broad discretion in fixing the amount of attorneys' fees to be awarded. Absent a clear abuse of discretion, this Court will not reverse the award.[35] The Court of Chancery found that "[e]ach form of Shawe's misconduct prejudiced Elting's ability to fully develop the record for, and needlessly complicated the litigation of, the Merits Trial. Shawe's actions also necessitated holding a second evidentiary hearing to address the issues raised by the Sanctions Motion."[36] The Court of Chancery did not award Elting superfluous damages: Elting incurred all of the expenses for which she is being recompensed. Thus, the Court did not abuse its discretion by awarding Elting her fees.

Further, as explained above, criminal sanctions were not imposed for perjury, and Shawe's due process argument is thus without merit.

---

[34] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *19.
[35] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del. 1998).
[36] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *19.

## III.

The Court of Chancery did not abuse its discretion by sanctioning Shawe based on a clear record of egregious misconduct and repeated falsehoods during the litigation. We therefore affirm the judgment of the Court of Chancery.