**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: April 4, 2023
Date Decided: July 11, 2023

Lydell Davis
1629 W. Ruscomb St.
Philadelphia, PA 19141

Wali W. Rushdan II, Esquire
Barnes & Thornburg LLP
222 Delaware Ave. Suite 1200
Wilmington, DE 19801

RE:  *Partition of the Real Estate of Lydell Davis and Shanna Veasley*,
C.A. No. 2021-1053-LWW

Dear Mr. Davis and Counsel:

In this action, the petitioner sought a partition of real property in New Castle, Delaware. The property was partitioned and sold. The remaining dispute concerns the distribution of proceeds from the sale of the property. Each party seeks offsets for various payments or improvements. Below, I consider these arguments and determine the parties' respective shares of the sale proceeds.

## I.    BACKGROUND[1]

On March 26, 2004, petitioner Lydell Davis and respondent Shanna Veasley purchased a home together as joint tenants with the right of survivorship.[2]   The property is located at 16 Jennings Court in New Castle, Delaware (the "Property").[3] Along with their child, the two lived at the Property until September or October 2010 when Davis moved out.[4]   In January 2013, Davis returned to live at the Property until December 2014.[5]

In January 2015, Davis vacated the Property permanently.[6]   Veasley continued to live at the Property with their child.[7]   Although Veasley acted as the child's sole custodial parent and primary caretaker,[8]   she never pursued formal child support

---

[1] The facts in this decision are found after the April 4, 2023 evidentiary hearing or drawn from undisputed allegations in the pleadings.  Testimony from the evidentiary hearing is cited as "[Name] Tr."  *See* Tr. of April 4, 2023 Evidentiary Hr'g (Dkt. 51).

[2] Pet. for Decree and Order of Distribution (Dkt. 40) ("Veasley Suppl. Submission.") ¶ 4; Davis Tr. 3; Pet. for Partition of the Real Estate of Lydell Davis and Shanna Veasley (Dkt. 1) ("Davis Pet.") Ex. 1 at 2-4 (deed for the Property).

[3] Davis Pet. ¶ 1.

[4] Veasley Suppl. Submission ¶¶ 5-6; Davis Tr. 4.

[5] Veasley Suppl. Submission ¶ 7; Davis Tr. 5-6.

[6] Veasley Suppl. Submission ¶ 7; Davis Tr. 6.

[7] Veasley Suppl. Submission ¶ 8; Davis Tr. 6.

[8] Veasley Suppl. Submission ¶ 8; Davis Tr. 6.

proceedings against Davis.[9]  Instead, Davis voluntarily made monthly payments to Veasley to support their child and maintain the Property.[10]  Between September or October 2010 and January 2015, Davis contributed at least $1,200 per month to the household.[11]  From January 2015 to August 2022, he contributed $500 per month.[12]

On December 3, 2021, Davis filed a pro se petition for a partition of the Property.[13]  On March 9, 2022, I held an initial hearing and gave Veasley an opportunity to file a written submission showing cause why a partition should not issue.[14]  She opted not to.  After the parties unsuccessfully attempted to negotiate a resolution, I informed the parties that I would proceed to order a partition and solicited recommendations for a Delaware attorney to serve as a trustee.[15]

---

[9] Veasley Suppl. Submission ¶ 9; Davis Tr. 9.

[10] Veasley Suppl. Submission ¶ 9; Davis Tr. 23-26.

[11] Veasley Suppl. Submission ¶ 11; Davis Tr. 21.

[12] Veasley Suppl. Submission ¶ 14; Davis Tr. 25.

[13] Dkt. 1.

[14] *See* Dkts. 16, 50.

[15] Dkt. 21.

On May 11, I entered an order confirming that a physical partition of the Property would be impractical and detrimental to the interests of the parties.[16]  I explained that:

> The only practical and equitable way to achieve a partition of the parties' interests is by sale of the Property and a division of the net sale proceeds, consistent with their ownership interest in the Property, after payment of court costs and sale costs, and after accounting for any expenditures each party has made for, or revenue or benefits he or she has received from, the Property.[17]

I therefore ordered a partition sale of the Property and appointed a Trustee to complete the sale.[18]

On August 17, the Trustee sought approval for a private sale of the Property for $180,000.[19]  I approved the sale on August 25.[20]  After accounting for expenses, including the mortgage loan payoff, the sale netted $88,747.84.[21]  I then granted the

---

[16] Dkt. 24.

[17] *Id.* ¶ 2.

[18] *Id.*

[19] Dkt. 25.

[20] Dkt. 28.  Concurrently, I approved an amended order allowing the property to be sold at a private sale in the Trustee's sole discretion.  Dkt. 27.

[21] Dkt. 30 ¶ 7 (Trustee's return of sale).  I approved the return of sale on November 23, 2022.  Dkt. 36.

Trustee's request for fees, which totaled $3,291.[22] This left $85,456.84 remaining in escrow from the sale of the Property.

After the sale, the parties filed supplemental submissions on the distribution of the sale proceeds.[23] On April 4, 2023, I held an evidentiary hearing at which three witnesses testified.[24]

## II.  ANALYSIS

Davis and Veasley owned the Property as joint tenants with the right of survivorship.[25] There is no evidence that the parties intended their original ownership to be anything other than a 50% split. "[E]quity compels an equal division based upon each co-tenant's ownership interest. Therefore, I will split the proceeds on an equal basis between the parties, subject to specific contributions and offsets."[26] "The party claiming contributions for taxes, repairs, or other costs has the burden of proof."[27]

---

[22] Dkts. 33 (Trustee requesting $3,013.75), 38 (approving the request), 44 (Trustee requesting $277.25), 46 (approving the request).

[23] Dkts. 39-41.

[24] Dkts. 49, 51

[25] Veasley Suppl. Submission ¶ 4; Davis Tr. 3; Davis Pet. Ex. 1 at 2-4 (Property deed).

[26] *Green v. Shockley*, 2022 WL 275975, at *3 (Del. Ch. Jan. 31, 2022).

[27] *Id.* at *7.

Davis argues that he is entitled to 75% of the remaining sale proceeds because a 2015 mortgage modification was undertaken by Veasley without his consent.[28] Veasley avers that she is entitled to $49,032.83 compared to Davis (before the remaining proceeds are split) because of her payments on the mortgage principal, property insurance, property taxes, and repairs and improvements to the Property.[29] Veasley also seeks attorneys' fees.[30]

After considering each party's position, I conclude that Davis's share of the proceeds should be decreased by $6,477.42. Correspondingly, Veasley's share should be increased by that amount. Veasley is not entitled to attorneys' fees.

## A. Child Support Payments

Davis appears to seek an offset for certain child support payments he made to Veasley.[31] Insofar as he is pressing the argument, such payments are not relevant to

---

[28] Suppl. Submission from Lydell Davis (Dkt. 39) ("Davis Suppl. Submission") at 2.

[29] Veasley Suppl. Submission at 14-15.

[30] *Id.* at 15.

[31] Davis Tr. 87-88.

this partition action.[32]  "The accounting in a partition action is confined to matters relating to the common land or estate in personal property."[33]

## B.  Mortgage Payments

Both Davis and Veasley seek offsets for their payments toward the principal of the Property's mortgage.  "[A] cotenant not in possession [] has a duty to contribute to the cotenant in possession as to any payments on a mortgage or for taxes."[34]  How the mortgage payments were allocated between Veasley and Davis is not a picture of clarity.  Based on the record, I have distilled who made mortgage payments during two time periods: July 2015 to September 2022; and March 2004 to June 2015.

### 1.  July 2015 to September 2022

I begin with the mortgage payments for the period from July 2015 to September 2022.[35]  In January 2015, when he permanently vacated the property, Davis reduced his monthly household contribution to $500.[36]  This reduction made

---

[32] 59A Am. Jur. 2d *Partition* § 137 ("[A]ccounting in a partition action . . . does not extend to such unrelated matters as conversion of personal property, marital matters, or unpaid child support.") (footnotes omitted).

[33] *Id.* (footnotes omitted).

[34] *Haygood v. Parker*, 2013 WL 1805602, at *3 (Del. Ch. Apr. 30, 2013).

[35] The sale of the Property closed in October 2022.  *See* Dkt. 30 Ex. 1.

[36] Veasley Suppl. Submission ¶ 14; Davis Tr. 25.

it difficult for Veasley to maintain the monthly mortgage payments, so she pursued a mortgage modification.[37]

The mortgage modification, which was effective in July 2015, reduced the monthly mortgage payments but extended the term of the loan.[38] The mortgage modification also provided principal deduction incentives.[39] These incentives, which totaled $10,000, were awarded for timely and consistent payment of the monthly mortgage obligations over a six-year period.[40]

As of July 2015, Veasley alone made the mortgage payments.[41] Annual tax and interest statements reflect the following annual payments on the principal:[42]

---

[37] Veasley Suppl. Submission ¶¶ 14-20; Veasley Tr. 53-54; Davis Tr. 4-5.

[38] Davis Pet. Ex. 1 ("Mortgage Modification Agreement") at 6-14. To the extent Davis avers that the modification reset the mortgage, there is no supporting evidence in the record. *See* Verification and Aff. of Shanna Veasley in Supp. of Pet. (Dkt. 40) ("Veasley Aff.") Ex. A (tax statement reflecting that the beginning mortgage principal for 2015 was $103,274.38, which is less than the original loan amount of $128,881); Mortgage Modification Agreement at 1 (listing original loan amount to be $128,881).

[39] Veasley Suppl. Submission ¶ 21.

[40] *Id.*; Letter to Court from Lydell Davis Regarding the Exhibits for Hr'g (Dkt. 47) ("Davis Ltr.") Ex. D; Veasley Aff. Ex. B.

[41] Veasley Pet. ¶ 24; Veasley Aff. ¶ 8. Veasley maintains that she was the sole contributor to the mortgage starting in April 2015. Based on the evidence, however, it seems more likely that she took over payments in July 2015, which was the effective date of the mortgage modification.

[42] Veasley Aff. Ex. A.

| Year | Incentive Payments on Principal | Direct Payments on Principal |
|---|---|---|
| 2015 | $0 | $0[43] |
| July to Dec. 2015 | $0 | $0 |
| 2016 | $1,000 | $1,924.65 |
| 2017 | $1,000 | $2,043.77 |
| 2018 | $1,000 | $2,167.79 |
| 2019 | $1,000 | $2,493.55 |
| 2020 | $1,000 | $2,439.20 |
| 2021 | $5,000 | $2,470.60 |
| Jan. to Sept. 2022 | $0 | $1,852.95 (estimated) |
| **Total (July 2015 to Aug. 2022)** | **$10,000** | **$15,392.51** |

To estimate the amount of principal Veasley paid from January to September 2022, I prorate the amount she paid in 2021 by nine months.[44] In total, I find that Veasley paid $15,392.51 of principal and obtained $10,000 of incentive payments towards the principal.

As a matter of equity, however, I decline to credit the $10,000 of incentive payments to Veasley. Davis credibly testified that he was not aware of the mortgage

---

[43] Veasley contends that the mortgage principal decreased by $1,434.71 in 2015. But the 2015 annual tax and interest statement indicates that the mortgage principal increased that year. The beginning principal balance was $103,274.38 and the ending balance was $104,709.09. *Id.* As such, I decline to attribute her any credit for the 2015 mortgage principal payments.

[44] $2,470.60 * (9 \div 12) = $1,852.95.

modification and that he did not sign the associated documentation.[45]  When Davis

learned of the modification six years later,[46] he contemplated filing a police report

but declined to do so to protect Veasley.[47]  Accordingly, I credit the $10,000 in

incentive reduction payments to Davis.

### 2.    March 2004 to June 2015

From March 26, 2004 (when the parties purchased the Property) to June 2015,

Davis alone paid the mortgage.[48]

---

[45] Davis Tr. 4-5, 9-10; *cf.* Veasley Tr. 38-40, 61.  The parties' testimony diverges on whether Davis signed the modification agreement.  Based on the record, it seems more likely that he did not. *Compare* Mortgage Modification Agreement at 7 (Davis's signature on the mortgage modification agreement) *with* Davis Ltr. Ex. B (Davis's signature on his driver license); *see also* Dkts. 1, 34, 39 (Davis's signature on various court filings); Davis Tr. 9-10; *cf.* Veasley Tr. 61.

[46] Davis Tr. 22-23.

[47] *Id.* at 10.  Veasley submitted a text message that purportedly references Davis's agreement to the mortgage modification.  Resp't's Resp. in Opp'n to Pet'r's Request (Dkt. 41) ¶ 8, Ex. A.  But the message is from October 2021, six years after the fact. *Id.*  The text message seems to indicate that Davis eventually supported the modification—not that he originally assented to or signed the written agreement. *See* Davis Tr. 78.

[48] Davis Suppl. Submission at 1; Davis Tr. 3-4, 6.  Veasley's testimony that the two contributed equally is inconsistent with the record. *See* Veasley Tr. 33-34, 57.  Davis earned more income than Veasley, who was unemployed for 2011 to 2013.  Davis Tr. 15; Veasley Tr. 34-35.  The parties also agreed that Davis contributed at least $1,200 per month to the household to pay various bills and expenses.  Davis Tr. 21; Veasley Tr. 36.  Veasley estimated the monthly mortgage (before 2015) to be around $900 per month and utilities to cost approximately $150 to $230 per month.  Veasley Tr. 56-57.  Davis's contribution of $1,200 covered the mortgage and utilities bills.  Further, Veasley provided no evidence of how much she contributed during this time. *See* Veasley Aff. ¶ 5; Veasley Suppl. Submission ¶¶ 10-13.

The original mortgage loan on the Property was $128,881.00.[49] The American Land Title Association (ALTA) settlement statement for the Property confirms that there was a $79,666.26 mortgage loan payoff, meaning this amount of principal remained as of September 2022.[50] Thus, the mortgage principal was reduced by $49,214.74 from the time Davis and Veasley bought the property to when they sold it in September 2022.[51] Given that the principal was reduced by a total of $25,392.51 during the period from July 2015 to September 2022, it follows that the principal was likewise reduced by $23,822.23 between March 2004 and June 2015.[52]

I find that Davis paid $23,822.23 of principal on the mortgage from March 2004 to June 2015. Accounting for the $10,000 in incentive reduction payments, Davis is credited a total of $33,822.23.

*　　*　　*

In sum, Davis contributed $33,822.23 to mortgage principal payments and Veasley contributed $15,392.51. Davis's share of the sale proceeds is increased by $9,214.86. Veasley's share is decreased by that amount.

---

[49] Mortgage Modification Agreement at 1.

[50] Dkt. 30 Ex. 1.

[51] $128,881.00 – $79,666.26 = $49,214.74.

[52] $128,881.00 – $79,666.26 – $25,392.51 = $23,822.23.

## C. Property Insurance and Property Tax Payments

"Delaware law requires cotenants to share equally the taxes imposed on jointly owned property and insurance costs associated with the property, even when one cotenant has exclusive possession of the property."[53]

From 2015 until the sale of the property, Veasley paid a total of $18,884.57: $7,967.50 in property insurance and $10,917.07 in property taxes.[54] These payments were as follows:

| Year | Property Insurance | Property Tax |
|---|---|---|
| 2015 | $1,001.00 | $1,387.94 |
| July to Dec. 2015[55] | $500.50 (estimated) | $693.97 (estimated) |
| 2016 | $1,040.00 | $1,386.17 |
| 2017 | $1,054.00 | $1,554.35 |
| 2018 | $1,065.00 | $1,660.19 |
| 2019 | $1,088.00 | $1,684.88 |
| 2020 | $1,113.00 | $1,688.03 |
| 2021 | $1,204.00 | $1,681.97 |
| Jan. to Sept. 2022[56] | $903.00 (estimated) | $1,261.48 (estimated) |
| **Total** **(July 2015 to Aug. 2022)** | **$7,967.50** | **$10,917.07** |

---

[53] *Est. of Weber v. Weber*, 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014).

[54] Veasley Aff. ¶¶ 16, 20, Ex. A.

[55] I calculate this figure by prorating the total amount paid in 2015 by six months. *See supra* note 44.

[56] I calculate this figure by prorating the total amount paid in 2022 by nine months. *See supra* note 44.

Davis proffered no evidence that he made any insurance or tax payments on the Property. Therefore, Davis's share of the proceeds is decreased by $9,442.28 and Veasley's share is increased by that amount.

### D. Repairs and Improvements

This court "may, as a matter of equity, take into consideration improvements by one [co-owner] and, 'to the extent those improvements have enhanced the value of the property, the improving [co-owner] will be compensated proportionally out of the proceeds of the sale.'"[57] The party seeking contribution for the improvements must prove that the improvements increased the market value of the property.[58]

Veasley submitted evidence that she made renovations to the home's bathroom, heat pump system, and electric water heater. She invested approximately $7,094 in material costs and $4,600 in labor costs to repair the bathroom.[59] She further invested approximately $5,989 in material and labor costs for the installation of a heat pump system and electric water heater.[60]

---

[57] *Ponder v. Willey*, 2020 WL 6735715, at *4 (Del. Ch. Nov. 17, 2020) (quoting *Weber*, 2014 WL 589714, at *5); *see also Wilson v. Lank*, 107 A. 772, 773 (Del. Ch. 1919).

[58] *Ponder*, 2020 WL 6735715, at *4.

[59] Veasley Suppl. Submission ¶¶ 51-57; Veasley Aff. ¶¶ 21-27, Exs. C-E; Veasley Tr. 48-51.

[60] Veasley Suppl. Submission ¶¶ 58-60, Ex. B; Veasley Aff. ¶¶ 28-34; Veasley Tr. 45-48, 50-51.

At the evidentiary hearing, Jacob Lipton, a licensed real estate broker with two decades of experience in the industry, testified that the improvements increased the market value of the Property by approximately $10,000 to $15,000.[61] Lipton's estimate is consistent with the evidence concerning costs that Veasley incurred in making the improvements.[62]

I adopt the midpoint of Lipton's analysis—$12,500—as the amount of value attributable to these repairs and improvements. Davis's share of the sale proceeds is decreased by $6,250 and Veasley's share is increased by that amount.

### E.    Attorneys' Fees

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[63] Exceptions to the American Rule include the bad faith exception and the common benefit doctrine.[64] I have no grounds to conclude that either exception

---

[61] Veasley Suppl. Submission Ex. A; Lipton Tr. 66-71, 75.

[62] Veasley incurred $17,683 in costs.

[63] *Green*, 2022 WL 275975, at *9 (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)).

[64] Delaware courts have awarded attorney's fees for bad faith conduct when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)). "The common benefit doctrine . . . is designed to equitably spread the costs of producing a

(or any other) applies here.[65]  Veasley's request for attorneys' fees is denied.  Each party will bear their own fees and costs.

## III.  CONCLUSION

Tallying up the various offsets described above, Davis's share of the sale proceeds is decreased by $6,477.42 and Veasley's share is correspondingly increased by that amount.  Assuming $85,456.84 remain in escrow and no further Trustee's fees or costs are deducted, Davis is entitled to $36,251.00 from the escrowed sale proceeds.  Veasley is entitled to the remaining $49,205.84.  This comes out to a 58% to 42% split in favor of Veasley.  The below table summarizes my analysis:

|  | Davis | Veasley |
|---|---|---|
| Adjustment for Mortgage Principal | $9,214.86 | ($9,214.86) |
| Adjustment for Property Tax and Property Insurance | $(9,442.28) | $9,442.28 |
| Adjustment for Repairs and Improvements | $(6,250.00) | $6,250.00 |
| Total Adjustment | $(6,477.42) | $6,477.42 |
| Amount in Escrow | $85,456.84 | |
| Amount in Escrow (Equal 50% Distribution) | $42,728.42 | $42,728.42 |
| **Distribution from Partition (Accounting for Adjustments)** | **$36,251.00** | **$49,205.84** |

---

benefit realized by a group, which benefit, absent the Plaintiff's efforts, would not exist."  *Moore v. Davis*, 2011 WL 3890534, at *2 (Del. Ch. Aug. 29, 2011) (emphasis omitted).

[65] *See Green*, 2022 WL 275975, at *3.

To the extent necessary for this decision to take effect, IT IS SO ORDERED.


Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor