**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted:  September 14, 2023
Final Report:  September 18, 2023

Jason C. Jowers, Esquire
Sarah T. Andrade, Esquire
Emily L. Skaug, Esquire
Bayard, P.A.
600 North King Street, Suite 400
Wilmington, Delaware  19801

Andrew L. Cole, Esquire
Nathaniel J. Klepser, Esquire
Cole Shotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware  190801

RE:  *Edward D. Meehan, Jr. v. Tiger Analytics, Inc.*,
C.A. No. 2023-0720-BWD

Dear Counsel:

The parties in this action have resolved all but one issue concerning the plaintiff's books and records demand.  The remaining issue is the plaintiff's request to shift attorneys' fees under the bad faith exception to the American Rule.  For the following reasons, I recommend that the request be denied.

## I.    BACKGROUND

Tiger Analytics, Inc. ("Tiger Analytics" or the "Company") is a Delaware corporation that provides marketing analytics, customer analytics, operations and planning services, and risk analytics. Dkt. 1 ¶ 9.  Edward D. Meehan, Jr. ("Plaintiff") is a Tiger Analytics stockholder. *Id*. Ex. A at 1.  On March 8, 2022, Plaintiff served a demand for books and records on the Company pursuant to 8 *Del. C.* § 220 for the

purpose of determining Plaintiff's percentage ownership in the Company and his resulting tax liabilities (the "First Demand"). JX 6.[1]

The Company failed to respond to the First Demand, and Plaintiff did not press the issue for eight months, until he served a renewed demand through new counsel on November 9, 2022 (the "Demand"). JX 8. The Demand sought expanded categories of documents in order to, among other purposes, value Plaintiff's shares and investigate possible wrongdoing in connection with transactions through which Plaintiff's equity interests purportedly were diluted. *Id*.

On December 2, 2022, the Company's counsel responded to the Demand, producing six documents, including the Company's bylaws, stock ledgers, and compensation plans pursuant to which equity interests were issued. JX 9 at 1. The December 2 response letter noted that although the scope of documents sought in the Demand was "broader than what is permitted under Delaware law," the Company expected that its "willingness to provide [Plaintiff] with a wide range of company documents will moot any dispute over his Section 220 demand." *Id*. at 2.

On December 23, 2022, the Company produced annual financial statements for the two years prior, a May 2022 409A valuation, and a form of stock option grant

---

[1] Joint trial exhibits are cited as "JX __".

agreement used in connection with the Company's equity incentive plan. JX 11. On December 29, 2022, Plaintiff's counsel pressed for additional documents requested in the Demand. JX 12 at 8-11. On January 17, 2023, the Company's counsel responded that it would be producing "board resolutions, director and shareholder consents, and tax documents" the first week of February, but that certain other documents requested by Plaintiff did not exist. *Id*. at 6-7. The parties then engaged, unsuccessfully, in settlement negotiations. *Id*. at 6.

Between March 10 and May 24, 2023, the parties did not communicate about the Demand. On May 24, Plaintiff's counsel emailed a copy of a draft Section 220 complaint, noting that "[s]hould [Plaintiff] be forced to file an action, you can expect a fee application after the Court directs Tiger to produce." *Id*. at 2. On May 30, the Company's counsel responded that the Company "would like until June 16, 2023, to make a final production of documents" that it "(1) has and (2) does not object to providing in response to [Plaintiff's] Section 220 request." *Id*. at 1-2.

On June 15, 2023, the Company retained new counsel, who informed Plaintiff's counsel that it would "be doing a detailed diligence investigation of the company's records with the objective of cleaning up its records and any or all deficiencies therein," "[o]ne of the results of [those] efforts w[ould] be to end up with a complete and accurate data room, and once our initial investigation is

complete, I have the Company's permission to voluntarily work with you to provide full and transparent disclosure to you so that [Plaintiff]'s lawsuit (and the associated expense of it) will not be required."  JX 13 at 5.

Plaintiff followed up with the Company several times over the next month. On June 23, the Company's counsel reported that:

> We have been actively communicating with the Company regarding its corporate records and have received (as recently as yesterday) additional documents that may be responsive to [Plaintiff]'s requests, which we are still reviewing and will provide as soon as we have verified their completeness.  We have sent additional requests to the Company that we believe will clarify some of the issues we have noted in the Company's corporate records, but given the complexity, this process is still ongoing.  While we cannot produce additional documents today, I am giving you my personal assurance that we are committed to this process, we have complete cooperation from our client at this time, and believe that additional documents can be produced over the course of the next two weeks.

JX 13 at 3.

On July 7, the Company's counsel provided an update, explaining that counsel "ha[d] spent a great deal of time understanding and tracking the various equity transactions of Tiger Analytics, Inc." and "the majority owners of the business were not meticulous in their record keeping and did not always observe strict corporate formalities."  JX 15 at 1.  At that time, counsel produced "a historical stock ledger showing a complete chain of custody of all shares that are currently issued, and a

corporate timeline summary that [counsel] created as a result of working through and understanding the many equity transactions of the Company." *Id*.

On July 17, Plaintiff filed a Verified Complaint for Inspection of Books and Records. Dkt 1. On July 30, the Company made a data room available to Plaintiff on an attorneys'-eyes-only basis pending the execution of a confidentiality stipulation. JX 17. On August 8, the Company confirmed that it had uploaded all documents responsive to the Demand. JX 20.

Documents in the data room included a July 26, 2023 "Joint Written Consent of the Sole Director and the Stockholders of Tiger Analytics, Inc." (the "Written Consent"), purporting to ratify certain transactions and other acts described in an attached "Affidavit" (the "Transactions").[2] JX 16. On August 14, Plaintiff served interrogatories on the Company instructing it to "[i]dentify any documents, including but not limited to any non-board level documents, that exist that back up, support, or relate to the [T]ransactions set forth and described in the [Written Consent]," and "[i]dentify the location and custodian of any of the documents that are identified in response . . . ." JX 22 at 11. The Company objected to those

---

[2] The Written Consent was produced in response to requests in the Demand for documents "sufficient to identify" stock issuances.

interrogatories on the grounds that it "ha[d] not interposed defenses relating to Plaintiff's status as a stockholder, propriety of purpose, or scope of inspection, ha[d] agreed to make (and indeed ha[d] made) the requested documents available, and the only issue remaining for potential determination [wa]s the scope of confidentiality protection afforded such documents . . . ." JX 26 at 3.

On August 24, 2023, Plaintiff filed its Pre-Trial Opening Brief identifying three issues for trial: (1) whether a confidentiality order should restrict Plaintiff from sharing documents produced in response to the Demand with other Tiger Analytics stockholders; (2) whether the Court should order the Company to identify the location of documents supporting the Transactions identified in the Written Consent; and (3) whether the Company should bear Plaintiff's attorneys' fees. Dkt. 19.

On August 30, the Company agreed to supplement its interrogatory responses. On August 31, the parties agreed to a confidentiality stipulation, mooting the first issue for trial. Dkt. 28. On September 5, Plaintiff confirmed that the Company had mooted the second issue for trial by supplementing its interrogatory responses and producing additional documents concerning the Transactions. Dkt. 34; *see also* JX 58.

On September 6, the Company filed its Pre-Trial Answering Brief addressing the final issue for trial—Plaintiff's fee request. Dkt. 35. On September 11, Plaintiff filed its Pre-Trial Reply Brief in further support of its fee request. Dkt. 39. On September 15, a trial on a paper record was held to address that issue.

## II. ANALYSIS

"Delaware courts follow the American Rule that 'each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation.'" *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *29 (Del. Ch. Nov. 24, 2020 (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)). An exception exists in equity, however, when a party litigates in bad faith. *Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004). This Court has recognized that in "extraordinary circumstances," "overly aggressive litigation strategies" employed to improperly resist a books and records demand may warrant fee-shifting. *Pettry*, 2020 WL 6870461, at *30.

A party seeking to shift fees must satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad-faith." *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)). To warrant fees, a litigant's conduct must be "glaring[ly] egregious[]." *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948,

at *6 (Del. Ch. July 7, 2023). "Bad faith is not something this court takes lightly, and it should not be alleged lightly." *Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019).

Here, Plaintiff asserts that the Company engaged in bad faith conduct supporting a fee award by (i) forcing Plaintiff to file this action to enforce a clearly defined and established right; (ii) taking unreasonable positions over the confidentiality stipulation; and (iii) wrongfully refusing to supplement its interrogatory responses and produce documents concerning the Transactions. Dkt. 39 at 2-4. These arguments do not demonstrate "clear evidence" of bad faith warranting a fee shift.

Plaintiff's primary argument is that he was forced to file suit to enforce a clear right to inspect books and records. According to Plaintiff, the Company improperly "delay[ed] [Plaintiff]'s access to the documents and increase[d] the expense of [Plaintiff] obtaining them, even as Defendant claimed to have no defenses." Dkt. 39 at 13. Although "fees may be awarded if it is shown that the defendant's conduct forced the plaintiff to file suit to secure a clearly defined and established right,"[3] I

---

[3] *Dearing*, 2023 WL 2632476, at *5 (citing *McGowan v. Empress Entm't Inc.*, 791 A.2d 1, 5 (Del. Ch. 2000).

am not convinced that the Company's conduct here amounts to bad faith. Plaintiff is right to complain that a complete response to the Demand should not have taken nine months.[4] But the timing alone does not give the full picture. The Company did not follow corporate formalities in its record keeping and, according to its counsel, "things were a mess."[5] In the months leading up to the litigation, the Company produced what it had, and ultimately engaged outside counsel to undertake an "audit" to locate additional responsive documents. When litigation was filed, rather than stand on its earlier objections to scope, the Company waived all defenses and kept its resources focused on finalizing and producing the necessary documents. The Company's initial efforts to respond to the Demand were dilatory, but on the whole, its conduct was not "glaringly egregious."

Aside from the Company's initial delay, Plaintiff's claims of bad faith are a stretch. Plaintiff seeks fees over the Company's positions on the confidentiality stipulation, pointing out that the Company did not request a confidentiality

---

[4] The Demand was served on November 9, 2022, and the Company confirmed that all documents responsive to the Demand had been uploaded to the data room on August 8, 2023. JX 8. At Plaintiff's request, the Company supplemented its production with additional documents concerning the Transactions by September 5, 2023.

[5] *See also* JX 15 at 1 (acknowledging that "it is absolutely clear that the majority owners of the business were not meticulous in their record keeping and did not always observe strict corporate formalities").

stipulation until after the litigation was filed; proposed a two-tiered stipulation when, according to Plaintiff, "attorneys' eyes only provisions are disfavored"; and then belatedly added language restricting consultants or experts that compete with the Company from accessing confidential material. Dkt. 39 at 15-16. Plaintiff complains that it was "forced to go to the expense of" negotiating the stipulation, but these issues were quickly and easily resolved. *Id*. at 16. The Company did not delay producing documents under the guise of negotiating the confidentiality stipulation, and nothing about the Company's positions on confidentiality indicate bad faith.[6]

Finally, Plaintiff asserts that the Company wrongfully resisted its interrogatories and supplemental document requests concerning the Transactions. Again, the Company's actions in this regard do not approach bad faith. Given the Company's agreement to produce all responsive documents regardless of location, its discovery objections were not totally unfounded. But rather than litigating the

---

[6] *See* JX 101 ¶ 3 ("All documents in the Data Room were provisionally marked AEO so that the Data Room could be made available to Plaintiff's counsel even as the parties continued to negotiate the terms of a confidentiality stipulation governing the use of the documents produced by the Company.").

issue, the Company moved quickly to moot it by amending its discovery responses *and* producing the documents in question. Dkt. 34; *see also* JX 58.

In the aggregate, the Company's conduct does not, to my mind, reflect an "abuse of process that is manifestly incompatible with justice" or "an attempt to game the system." *Donnelly*, 2019 WL 5446015, at \*6. The facts here are a far cry from *Gilead*, where the defendant "block[ed] legitimate discovery, misrepresent[ed] the record, and t[ook] positions for no apparent purpose other than obstructing the exercise of Plaintiffs' statutory rights." *Pettry*, 2020 WL 6870461, at \*30. This case is not *Seidman*, where the defendant "declined to produce a single document to Plaintiff" and "took a series of litigation positions that, when viewed collectively, were glaringly egregious." *Seidman*, 2023 WL 4503948, at \*6. And, while perhaps a bit closer, the Company's conduct here also does not rise to the level of bad faith in *McGowan*, where the company "acted in subjective bad faith" by "falsely promising to produce corporate records that [a director] was clearly entitled to inspect" over a period of 16 months, then retracting that promise and raising defenses to resist the demand in litigation. *McGowan*, 791 A.2d at 5. The Company should have moved faster when it first received the Demand, but it did try in good faith to resolve the outstanding issues. Like the company in *Dearing*, the Company's

conduct here, "viewed in its totality, does not reflect bad faith." *Dearing*, 2023 WL

2632476, at \*7.

## III.  CONCLUSION

I recommend that Plaintiff's request for an award of attorneys' fees be denied.

This is a final report pursuant to Court of Chancery Rule 144.  The stay of exceptions

entered under the Chancellor's assignment letter is hereby lifted.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Magistrate in Chancery

cc:    All counsel of record (by File & ServeXpress)