# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| O.R.C. PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1239-BWD |
| | ) | |
| SBTN HOLDINGS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: February 9, 2026
Date Decided: March 17, 2026

Timothy S. Martin, WHITE AND WILLIAMS, LLP, Wilmington, DE; OF COUNSEL; Daniel S. Goldstein and Alexander Bau, SMITH, GAMBRELL & RUSSELL, LLP, New York, NY; *Attorneys for Plaintiff O.R.C. Partners, LLC*.

Andrea S. Brooks and Jordan P. Hicks, WILKS LAW, LLC, Wilmington, DE; *Attorneys for Defendant SBTN Holdings, LLC*.

**DAVID, V.C.**

This post-trial memorandum opinion decides whether the plaintiff, O.R.C. Partners, LLC ("O.R.C." or "Plaintiff"), is a member of the defendant, SBTN Holdings, LLC ("SBTN Holdings" or "Defendant"), with standing to inspect its books and records.

In 2017, nonparties Avraham Trachtingot and Assaf Levy solicited Raz Oded and Or Taubin's investment in SBTN Holdings, a Delaware limited liability company that owns an indirect interest in a residential apartment complex in Memphis, Tennessee. Oded and Taubin agreed to invest through O.R.C. To facilitate the investment, O.R.C., Trachtingot (through his company Alakarka LLC), and Levy (through his company Vertice Mutual LLC) entered into a contract they called a "partnership agreement" to govern the internal affairs of SBTN Holdings. Under the partnership agreement, O.R.C. invested $1,625,000 in exchange for an 80% membership interest in SBTN Holdings.

In 2018, the parties agreed to replace the partnership agreement with a new operating agreement, but despite lengthy negotiations, they never finalized that document. After the project was refinanced in 2022, SBTN Holdings purported to use the proceeds to "repay" O.R.C.'s investment as a "loan." In late 2024, O.R.C. served a books and records demand seeking to investigate (among other things) potential wrongdoing in connection with the refinancing. SBTN Holdings rejected the demand on grounds that O.R.C. was not a member, and this lawsuit followed.

1

At trial, SBTN Holdings argued that days before the partnership agreement was signed (and unbeknownst to O.R.C.), Trachtingot's family members executed a different operating agreement to govern SBTN Holdings. Under that purported agreement, approval of the managing member was required to admit new members, and the managing member never consented to a transfer of membership interests to O.R.C. SBTN Holdings concedes that the parties also entered into the partnership agreement but asserts that the partnership agreement was canceled and O.R.C.'s investment was returned.

For reasons explained below, the Court finds that SBTN Holdings is governed by the partnership agreement, under which O.R.C. is an 80% member. Judgment is therefore entered for O.R.C.

## I. BACKGROUND

The following facts are as the Court finds them following a one-day trial held on December 3, 2025.[1]

---

[1] Citations to "PTO ¶ __" refer to the Joint Pre-Trial Stipulation and Order. Dkt. 34. Trial testimony is cited as "Tr. (Witness) at __". Dkt. 38. Joint exhibits are cited as "JX __". Dkt. 27. At trial, the parties presented several joint exhibits that were translated from Hebrew into English; the accuracy of such translations has not been questioned.

**A.      Oded And Taubin Agree To Invest In Stonebrook Apartments Through SBTN Holdings.**

O.R.C. is a Delaware limited liability company headquartered in Herzliya, Israel, formed by Raz Oded and Or Taubin to invest in defendant SBTN Holdings.[2]

SBTN Holdings is a Delaware limited liability company headquartered in Dallas, Texas.[3]  SBTN Holdings' initial managers were Alakarka LLC ("Alakarka"), a Delaware limited liability company managed by Avraham Trachtingot, and Vertice Mutual LLC ("Vertice"), an entity managed by Assaf Levy.[4]

SBTN Holdings owns a 75% membership interest in SBTN Apartments, LLC ("SBTN Apartments"), a limited liability company that owns and operates a 236-unit residential apartment complex in Memphis, Tennessee called Stonebrook Apartments.[5]  SBTN Realty, LLC ("SBTN Realty") manages SBTN Apartments and owns the remaining 25% interest in SBTN Apartments.[6]

---

[2] PTO ¶ 1; *see* JX 37 at 5.

[3] PTO ¶ 2.

[4] *Id.* ¶ 3; *see* JX 6 [hereinafter Partnership Agt.] at 2.

[5] PTO ¶¶ 4, 6; *see* Def.'s Post-Trial Answering Br. [hereinafter AB] at 4, Dkt. 41.

[6] PTO ¶ 5.

In July 2017, Levy contacted Oded and Taubin to solicit their investment in Stonebrook Apartments.[7] After a period of negotiation, Oded and Taubin agreed to invest $1,625,000 in exchange for a 60% ownership interest in the property.[8]

Over the following weeks, Oded, Taubin, Levy, and Trachtingot exchanged drafts of a contract—first termed an "LLC-Affiliate Agreement to Join SBTN Holdings, LLC" and later labeled a "Partnership Agreement"—to govern and memorialize the terms of Oded and Taubin's investment in SBTN Holdings.[9]

### B.    The Purported Operating Agreement

SBTN Holdings was formed as a Delaware limited liability company through the filing of a Certificate of Formation with the Delaware Secretary of State on August 3.[10]

Defendant contends that on September 13, Alakarka and four of Trachtingot's family members entered into a limited liability company agreement to govern SBTN Holdings (the "Purported Operating Agreement").[11] The only evidence in the record

---

[7] JX 2 at 1.

[8] JX 3 at 1; Tr. (Taubin) at 18:10–14.

[9] JX 4 at 1, 3; *see* JX 6 at 1.

[10] JX 1.

[11] The Purported Operating Agreement states that Alakarka owns 5%, Josef David Trachtingot owns 25%, Itschak Trachtingot owns 23.34%, Ariel Trachtingot owns 23.33%, and Amitai Trachtingot owns 23.33% of the membership interests in SBTN Holdings. DX-1, Ex. B.

of the Purported Operating Agreement is a PDF of that document without metadata and Trachtingot's self-serving testimony that the Purported Operating Agreement was prepared by counsel and signed by his family members.[12] The trial record does not contain a single contemporaneous document (such as a communication discussing or transmitting the Purported Operating Agreement) that might support the authenticity of the Purported Operating Agreement.

Section 11.01 of the Purported Operating Agreement states that:

> Without the prior written approval of the Managing Member, which approval shall not be unreasonably withheld, no Member shall have the right to: (a) sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or (b) gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law), all or part of its Membership Interest.[13]

Relying on this language, Defendant contends that the only members of SBTN Holdings are Alakarka and Trachtingot's family members.[14]

## C.     The Partnership Agreement

On September 14, the day after the Purported Operating Agreement supposedly was signed, Levy sent Oded and Taubin a "Partnership Agreement" to

---

[12] Tr. (Trachtingot) at 197:2–202:9.

[13] DX-1, Ex. B § 11.01.

[14] Tr. (Trachtingot) at 224:23–225:9.

govern the internal affairs of SBTN Holdings.[15]  The Partnership Agreement, which was signed by Levy on behalf of the "General Partner," states that the "Member Partner"—later designated as O.R.C.[16]—would acquire 80% of the membership interests in SBTN Holdings in exchange for $1,625,000, with SBTN Holdings' General Partners, Vertice and SBTN Venture, LLC (an entity controlled by Alakarka), retaining 3.82% and 16.18% membership interests, respectively.[17]  The next day, September 15, O.R.C. transferred $1.1 million to SBTN Holdings.[18]

---

[15] *See generally* Partnership Agt.  Though the parties refer to this document as a "Partnership Agreement," it purports to govern the affairs of SBTN Holdings, a limited liability company.

A translated copy of the Partnership Agreement introduced into evidence was unsigned, but the parties agree that the original, Hebrew-language Partnership Agreement was signed. Tr. at 27:11–29:5.

[16] At the time the General Partner signed the Partnership Agreement, O.R.C. was not yet formed.  O.R.C. was formed shortly thereafter, JX 37 at 3, and the parties agree that O.R.C. is the entity intended to be bound by the Partnership Agreement. *See, e.g.*, JX 4 at 1 (Levy explaining to Trachtingot, Oded, and Taubin that he "recommend[s] that we conclude and close with [Oded] being the one who temporarily sign[s] with us, and then change the composition of the companies according to the advice you receive").

Trachtingot's counsel prepared O.R.C.'s operating agreement, which states that O.R.C. was formed to "own, invest in . . . and manage a membership interest" in SBTN Holdings. JX 37 at 5; Tr. (Taubin) at 122:19–123:1.

[17] Partnership Agt. § 4.6.

[18] Tr. (Taubin) at 30:1–7.

On January 15, 2018, Taubin sent Levy a countersigned copy of the Partnership Agreement that included minor revisions to reflect the transfer of funds O.R.C. had already made to SBTN Holdings and procedures for future transfers.[19]

Between September 2017 and February 2018, O.R.C. made additional transfers of $100,000 and $277,000 to SBTN Holdings.[20] In addition, at the Stonebrook Apartments closing, O.R.C. received a $194,000 cash credit, which it reinvested in SBTN Holdings.[21] In total, O.R.C. invested $1,672,000 in SBTN Holdings.[22]

In March 2018, Trachtingot sent SBTN Holdings' accountants the following organizational chart representing that O.R.C. owned 80% of the membership interests in SBTN Holdings:[23]

---

[19] JX 8 at 12–13; Tr. (Taubin) at 39:2–41:24.

[20] JX 12 at 1; JX 24 at 1; Tr. (Taubin) at 30:8–13, 32:1–17.

[21] *See* Tr. (Taubin) at 24:18–22.

[22] *Id.* at 24:24–25:7.

[23] JX 9 at 5.



**ORGANIZATIONAL CHART**

Stonebrook Apartments – Memphis, Tennessee

### D. The Parties Attempt To Replace The Partnership Agreement With An Operating Agreement But Fail To Reach Agreement.

At some point in 2018, the parties' relationship broke down, and Taubin and Oded asked that Levy be removed from SBTN Holdings.[24]

On August 23, Trachtingot sent Taubin and Oded what he characterizes as a "settlement agreement" under which Levy would exit the investment and Defendant

---

[24] *See* Tr. (Taubin) at 118:8–23; *id.* (Trachtingot) at 218:11–20.

would pay O.R.C. $100,000, an "amount that [the parties] agreed to start fresh going forward," with an exchange of mutual releases.[25] Trachtingot explained:

> [W]e would replace the existing [P]artnership [A]greement, by means of an appendix that cancels it and refers to an operating agreement with a different premium model (promotion based on success—10% priority per year on the equity invested and not yet returned, and beyond that, a 60/40 distribution in the current and in the sale).[26]

Trachtingot noted that his attorney had "handled the preparation of the operating agreement" and asked O.R.C. to prepare a "cancellation document" with the following terms:

> A. The Raz Group will receive a total of $100,000 ($30,000 at the time of signing the agreements, as well as 4 quarterly payments of $17,500 each).
>
> The company [Trachtingot] own[s] will buy [Levy's] share, and thus [Levy] will exit the transaction entirely, and will no longer be a partner in the distribution of profits/premiums in respect of the O.R.C. PARTNERS, LLC Group[.]
>
> C. Mutual agreement regarding the absence of future claims and claims regarding the transaction and its representations, vis-à-vis the managing partner and the people behind him ([Trachtingot] and [Levy]).[27]

---

[25] JX 11 at 1; Tr. (Trachtingot) at 219:14–220:13; *see* AB at 11–12.

Trachtingot's email also attached a Schedule K-1 ("K-1") reflecting O.R.C.'s 80% interest in SBTN Holdings for 2017. JX 11 at 1–2. Of note, the 2017 K-1 and K-1s issued each year thereafter identified O.R.C. as a "[l]imited partner or other LLC member" with an 80% interest. *Id.* at 2. JX 24 at 1; JX 35 at 2; JX 36 at 2; JX 47 at 2; JX 52 at 2; JX 55 at 2.

[26] JX 11 at 1.

[27] *Id.*

Taubin replied the same day, requesting "that you or a lawyer on your behalf formulate the matter as you understand and we will make comments as necessary later."[28]

On September 4, Trachtingot sent Taubin a draft contract entitled "Appendix to the Partners Agreement to Join the LLC SBTN Holdings LLC," as well as a draft limited liability company agreement for SBTN Holdings (the "2018 Draft Operating Agreement").[29] The 2018 Draft Operating Agreement attached the following "Members Schedule," accounting for Trachtingot's acquisition of Levy's interests but otherwise consistent with the parties' interests under the Partnership Agreement:[30]

### MEMBERS SCHEDULE

| Name of Member | Ownership Interest Percentage |
|---|---|
| ALAKARKA LLC | 3.82% |
| SBTN VENTURE LLC | 16.18% |
| O.R.C. PARTNERS, LLC | 80.00% |
| **TOTAL** | **100.00%** |

Throughout September 2018, Trachtingot and O.R.C. continued to negotiate the 2018 Draft Operating Agreement.[31] On September 21, Trachtingot sent

---

[28] JX 13 at 1.

[29] *Id.* at 1, 3, 5.

[30] *Id.* at 40.

[31] *See, e.g.*, JX 15; JX 16; JX 17; JX 18.

additional edits to the 2018 Draft Operating Agreement,[32] and on September 25, Taubin responded: "This is acceptable in principle. I just want to make sure that where you wrote 'in this option there will be no linkage' you meant 3% brokerage fees and not what was written before about the [80/20] option."[33] Trachtingot replied and Taubin confirmed his agreement,[34] asking Trachtingot to "put it in writing and give it to us for reference."[35]

On September 27, consistent with the terms of the "settlement agreement,"[36] SBTN Holdings transferred funds to O.R.C.[37]

In an October 10 email, however, Taubin acknowledged that the Partnership Agreement remained in effect with the 2018 Draft Operating Agreement not yet signed, explaining that he "would like to end the [Partnership Agreement] this week, since we have already told our partners that we have finished the matter with [Levy] and are signing the [2018 Draft Operating Agreement], etc."[38] Trachtingot

---

[32] JX 18 at 2.

[33] *Id.* at 1–2.

[34] JX 19 ("Things are approved.").

[35] JX 18 at 1.

[36] JX 13 at 4.

[37] JX 20 at 1.

[38] JX 21 at 1.

responded, "if you could put it in writing as an appendix that overrides the [Partnership Agreement] in English, that would be great."[39]

More than a month later, on November 14, Oded emailed Trachtingot, reminding him that the parties still had not "finished the paper between [them]."[40] After repeated requests from O.R.C., on November 19, Trachtingot's attorney, Erik Wiesel, circulated "the most recent draft" of the 2018 Draft Operating Agreement for O.R.C.'s review.[41] Still, the parties never signed it.

In February 2020, Trachtingot sent his accountants an organizational chart for Stonebrook Apartments, which continued to reflect O.R.C.'s 80% membership interest in SBTN Holdings.[42]

### E. SBTN Apartments Refinances Stonebrook Apartments.

On May 10, 2021, Wiesel emailed Taubin and Oded, explaining that Trachtingot was "refinancing the Stonebrook deal in Memphis and as part of the due diligence underwriting the lender need[ed] information about [O.R.C.]" since O.R.C. "own[ed] most of the deal."[43] As the parties exchanged emails about

---

[39] *Id.*

[40] JX 22 at 1.

[41] JX 23 at 1, 5.

[42] JX 33 at 4.

[43] JX 37 at 1.

information requests from the lender,[44] Trachtingot claimed that O.R.C.'s investment in SBTN Holdings was not memorialized in any written agreement.[45] Trachtingot proposed a new draft "agreement attesting to the connection between the property and SBTN Holdings and SBTN Realty."[46]

On November 16, SBTN Apartments and Arbor Private Label, LLC entered into a Loan and Security Agreement to refinance Stonebrook Apartments.[47] SBTN Apartments represented in that agreement that "[n]o single investor holds 25% or more interest in" SBTN Holdings.[48]

On December 26, Trachtingot emailed Oded a spreadsheet that "include[d] the net use of proceeds from [the] refinance, proposed terms for [the] partnership (referring to the 'original understandings' and 'meeting reference' for comparison), and payables."[49] Trachtingot's email also included loan documents and a closing statement that supported the use of proceeds.[50] Trachtingot told Oded that O.R.C. would receive approximately $2 million in the refinancing:

---

[44] JX 40 at 2–6.

[45] *Id.* at 2.

[46] *Id.*

[47] JX 44 at 11.

[48] *Id.* at 156.

[49] *Id.* at 1.

[50] *Id.*

[I]n order to bring the "past" to an amicable agreement we went further to allow for 2MM distribution to [O.R.C.] above [O.R.C.'s] share of available funds for distribution, under the assumption this will allow us to proceed as partners with agreed terms per proposed.[51]

The spreadsheet attached to Trachtingot's email indicated O.R.C.'s investment was "$1.375MM" "based on actual net investment."[52] On December 30, Oded pointed out that O.R.C. had in fact contributed $1,625,000.[53] Trachtingot said he saw "no point in continuing to 'argue' about how much [O.R.C. has] invested. In order to move forward, we must agree on the outline of the partnership."[54]

### F.    SBTN Holdings Makes A Payment To O.R.C.

Defendant asserts that the parties subsequently agreed that SBTN Holdings would send O.R.C. $1,006,140 either as a distribution, if the parties could agree to a form of operating agreement, or as a repayment of a loan, if they could not.[55] SBTN

---

[51] *Id.*

[52] *Id.* at 7.

[53] JX 46 at 1.

[54] *Id.*

[55] *See* JX 48 ("Raz, we discussed your request and feel comfortable that the $1MM you requested would be sent to you either on account of the 'Special Distribution' should we reach agreement that we are exchanging drafts on or as a return of funds you provided Stonebrook if we don't reach agreement."); AB at 19 ("After months of trying yet again to come to an agreement with O.R.C. to no avail, the parties agreed that SBTN Holdings and SBTN Apartments' counsel would send O.R.C. $1,006,140.").

Holdings wired those funds to O.R.C. on June 29, 2022,[56] but O.R.C. contends they were a distribution from the refinancing, not a repayment of any "loan."[57]

On August 24, 2023, Alakarka's counsel sent a letter to O.R.C.'s counsel stating as follows:

> Alakarka, LLC is now convinced that under all of the circumstances presented by the parties' apparent adversity and the failure, despite multiple attempts, to reach agreement on the economics, or other basic terms, of a company agreement, an agreement of the nature presented in the latest draft is not feasible and will not lead to a successful partnership.
>
> As such Alakarka would like to reach agreement on one of the following two options:
>
> 1.  A refund of unrecovered funds to your client with 4% annual noncompounded interest from date of Alakarka receipt until repayment.
>
> 2.  Alternatively, if [O.R.C.] was willing to accept "silent partner" status Alakarka would accept [O.R.C.] as an investor in the company subject to the same terms and conditions as the other investors in the Stonebrook Apartments acquisition:
>
>     a.  8% annual preference (cumulative but not compounded) on unrecovered cash contributions.
>
>     b.  All further distributions (other than capital events) 60% to LP (including [O.R.C.]), 40% to general partner; and

---

[56] See JX 49 ("[O.R.C.] requested a wire transfer for the return of its funds to Israel and in accordance with that request, on behalf of [SBTN Apartments], we wired the funds to its Israel account at the bank on or about June 29, 2022.").

[57] Tr. (Taubin) at 90:2–7.

c. Net proceeds of capital events would be distributed pro rata first to any outstanding preference, then to capital balances, and thereafter as provided in item b.[58]

Nothing in the record evidences O.R.C.'s agreement to this proposal.

## G. O.R.C. Demands Books And Records.

On October 31, 2024, O.R.C. served a books and records demand (the "Demand") on SBTN Holdings and SBTN Apartments pursuant to 6 *Del. C.* § 18-305(a).[59] In the Demand, O.R.C. sought books and records for the purpose of:

evaluating the status of the business and financial condition of SBTN . . . [and] investigating potential wrongdoing and/or mismanagement and/or self-dealing, including but not limited to: (i) the lack [of] transparency into distributions to members of the LLC, and in particular, the lack of transparency with respect to the refinancing of the Stonebrook Apartments property and distributions to members in connection therewith, and (ii) the failure to pay distributions to O.R.C. in connection with O.R.C.'s preferred return.[60]

The Demand requested six categories of documents, including:

(1) True and full information regarding the status of the business and financial condition of SBTN, including but not limited to rent rolls, appraisals, cash flow statements, balance sheets, and rates of tenants' defaults;

(2) A current list of the name and last known business, residence or mailing address of each member and manager;

---

[58] JX 54 at 1.

[59] JX 56 at 3–6.

[60] *Id.* at 5.

(3) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member;

(4) Records of all payments or distributions made to any members, their affiliates, or any third parties on their behalf, since October 7, 2017;

(5) True and full information regarding the refinancing of the Stonebrook Apartments property, including but not limited to the terms of the refinancing, financial distributions in connection with the refinancing, communications with attorneys who worked on the refinancing, and the closing binders;

(6) True and full information regarding any financial losses incurred by SBTN and SBTN Apartments LLC since October 7, 2017, including the method of calculation and all documentation demonstrating the losses.[61]

On November 13, SBTN Holdings rejected the Demand on the grounds that O.R.C. is not a member of SBTN Holdings with standing to inspect books and records, explaining:

We are not aware, nor upon diligent search have we located, a formation document or Operating Agreement, which establishes O.R.C. Partners, LLC['s] claimed "80% Membership" in SBTN Holdings, LLC. While the parties certainly discussed the possibility of establishing SBTN Holdings, LLC with shared membership, and exchanged drafts of certain documents, the parties never agreed on terms and no documents or agreements were ever executed. SBTN Holdings, LLC, was established with 100% of the membership interests vesting in the other entity members. Those entities are the sole Members of SBTN Holdings, LLC. O.R.C. Partners, LLC, may be a

---

[61] *Id.* at 4–5 (footnote omitted).

17

creditor of SBTN Holdings, LLC, by virtue of the purchase loan it made to SBTN Holdings, LLC, but the vast majority of that loan has already been repaid to O.R.C. Partners, LLC by SBTN Holdings, LLC.

As such, O.R.C. Partners, LLC has no standing to demand any "rights" in SBTN Holdings, LLC, provided to Members under the Act, nor is O.R.C. Partners, LLC, entitled to the confidential business records and other information of SBTN Holdings, LLC.[62]

## H.    Procedural History

On December 3, O.R.C. initiated this action through the filing of a Verified Complaint Pursuant to 6 *Del. C.* § 18-305 to Compel Inspection of Books and Records (the "Complaint").[63]   On December 27, SBTN Holdings filed an Answer with Affirmative Defenses and Verified Counter-Claim for Declaratory Judgment (the "Counterclaim"), seeking a declaratory judgment that O.R.C. is not a member of SBTN Apartments.[64]  The Court held a one-day trial on December 3, 2025.[65]  Post-trial briefing concluded on February 9, 2026.[66]

---

[62] JX 57 at 1.

[63] Verified Compl. Pursuant to 6 *Del. C.* § 18-305 to Compel Inspection of Books and Records [hereinafter Compl.], Dkt. 1.

[64] Def.'s Answer with Affirmative Defenses and Verified Counter-Cl. For Declaratory J., Dkt. 7.  At trial, Defendant's counsel informed the Court that Defendant no longer wished to prosecute its counterclaim, requesting dismissal pursuant to Court of Chancery Rule 41(a)(2).  Tr. at 6:9–7:4.

[65] Dkt. 35.

[66] On January 15, 2026, O.R.C. filed its post-trial opening brief.  Pl. O.R.C. P'rs, LLC's Opening Post-Trial Br. [hereinafter OB], Dkt. 39.  On January 30, SBTN Holdings filed its post-trial answering brief.  AB, Dkt. 41.  On February 9, O.R.C. filed its post-trial reply brief.  Pl. O.R.C. P'rs, LLC's Post-Trial Reply Br. [hereinafter RB], Dkt. 43.

## II. ANALYSIS

### A. Plaintiff Is A Member Of SBTN Holdings.

Section 18-305(a) of the Limited Liability Company Act (the "LLC Act") affords members of a Delaware limited liability company the right to obtain books and records of the company "from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company." 6 *Del. C.* § 18-305(a). "Entitlement to books and records under Section 18-305 is 'status related'—under the statute, only a member or a manager may access the company's books and records." *Gill v. Regency Hldgs., LLC*, 2023 WL 4607070, at \*10 (Del. Ch. June 26, 2023). Defendant contests Plaintiff's entitlement to books and records solely on the basis that O.R.C. is not a member of SBTN Holdings.

A member is "a person who is admitted to a limited liability company as a member as provided in § 18-301 of" the LLC Act. 6 *Del. C.* § 18-101(13). Section 18-301(b) states that a person may be admitted as a member of an LLC "at the time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, upon the consent of all members or as otherwise provided in the limited liability company agreement." 6 *Del. C.* § 18-301(b).

## 1. The Parties' Contentions

Defendant contends that the Purported Operating Agreement governs the affairs of SBTN Holdings. The Purported Operating Agreement identifies Alakarka and Trachtingot's family members as the members of SBTN Holdings, and Section 11.01 of that document purports to require "the prior written approval of the Managing Member" (*i.e.*, Trachtingot, through Alakarka)[67] before a member can "transfer . . . all or part of its Membership Interest."[68] According to Defendant, because the parties never finalized the 2018 Draft Operating Agreement, Trachtingot never consented to a transfer of membership interests to O.R.C., and thus, Alakarka and Trachtingot's family members remain the sole members of SBTN Holdings.

Defendant acknowledges that the parties entered into the Partnership Agreement, but contends that it was canceled under the parties' "settlement agreement."[69] Per Defendant, when the parties reached an impasse on the 2018 Draft Operating Agreement, SBTN Holdings repaid most of O.R.C.'s capital contributions through funds received in the refinancing, as if O.R.C.'s investment had been a

---

[67] DX-1 at 26.

[68] *Id.* § 11.01.

[69] *See* Tr. (Trachtingot) at 219:14–221:4; AB at 2.

20

loan.[70]  Defendant contends that O.R.C. accepted the funds as "a return of money it sent to SBTN Apartments, not as a member of SBTN Holdings."[71]

Plaintiff tells a different—and ultimately, more persuasive—story.  According to Plaintiff, the Purported Operating Agreement is not authentic and O.R.C. was never made aware of it.[72]  Instead, the parties entered into the Partnership Agreement to govern the internal affairs of SBTN Holdings, including O.R.C.'s membership interest therein.[73]  When Levy exited the investment, the parties agreed they would replace the Partnership Agreement with a new operating agreement, but because they never reached agreement on the 2018 Draft Operating Agreement, they likewise never rescinded the Partnership Agreement.[74]  And under the Partnership Agreement, O.R.C. is an 80% member of SBTN Holdings.

### 2. O.R.C. Is A Member Of SBTN Holdings Under The Partnership Agreement.

From the evidentiary record presented at trial, I conclude that the Partnership Agreement governs the internal affairs of SBTN Holdings.  Plaintiff has met its

---

[70] *See* AB 19–21 ("[T]he record reflects that O.R.C. always knew SBTN Holdings' position was that O.R.C. is a lender/creditor if the parties fail to amend SBTN Holdings' LLC Agreement.").

[71] *Id.* at 21, 29.

[72] OB at 26.

[73] *Id.* at 22–23.

[74] *See* OB at 2; RB at 9.

burden to prove by a preponderance of the evidence that O.R.C. is a member of SBTN Holdings.

> **a. The Parties Intended The Partnership Agreement, And Not The Purported Operating Agreement, To Govern The Entity In Which O.R.C. Invested.**

Defendant contends that the Purported Operating Agreement is the governing operating agreement of SBTN Holdings. Based on my assessment of the trial record, I am convinced that the parties intended the Partnership Agreement to govern the internal affairs of SBTN Holdings.

At trial, Defendant failed to prove the Purported Operating Agreement's authenticity—in other words, that the document was, in fact, executed by Trachtingot's family members in September 2017. As noted above, other than Trachtingot's self-serving testimony, the only record evidence of the Purported Operating Agreement is a PDF copy of the document without metadata. The trial record does not contain a single contemporaneous document (such as a communication discussing or transmitting the Purported Operating Agreement) that might support its authenticity. Trachtingot never told Oded or Taubin about the Purported Operating Agreement, and O.R.C. did not learn of it until this litigation. And Defendant cannot explain why Trachtingot's family members supposedly own

all the membership interests of an entity in which they made no investment and played no role.[75]

Defendant asserts that Trachtingot's counsel prepared the Purported Operating Agreement for the lender when seeking "preliminary approval" to obtain financing for the initial purchase of Stonebrook Apartments.[76] Defendant says that "[t]he final lending application was submitted to the bank in June 2017,"[77] which does not explain why the Purported Operating Agreement was signed months later, in September 2017. But even under that version of the facts, the record is clear that the parties here did not intend for the Purported Operating Agreement to govern the internal affairs of the entity in which O.R.C. invested capital, regardless of whatever Trachtingot represented to the lender.

Instead, the record shows that just days after the Purported Operating Agreement supposedly was signed, the parties entered into the Partnership Agreement to govern the affairs of SBTN Holdings. Defendant points out that the

---

[75] Tr. (Taubin) at 56:3–22 ("I have heard about the names of [the apparent] Trachtingot family members for the first time during this legal procedure."); *id.* (Trachtingot) at 227:20–23 ("Q. . . . [H]ow much capital did your father and three brothers contribute towards the acquisition of Stonebrook properties? A. I do not remember.").

[76] *Id.* (Trachtingot) at 192:12–193:5, 197:24–199:17. The Purported Operating Agreement contains a fax machine stamp with the date September 13, 2017, suggesting the document may have existed as of that date for some purpose. DX-1 at 30.

[77] AB at 5.

parties never signed an identical version of the Partnership Agreement. On September 14, 2017, Levy sent Oded and Taubin a signed copy of the Partnership Agreement,[78] and the next day, O.R.C. transferred $1.1 million to SBTN Holdings, consistent with the Partnership Agreement. O.R.C. did not countersign the Partnership Agreement until January 15, 2018, and the copy it provided made minor edits to reflect that a transfer of funds had been made.[79] These edits were immaterial, and the records shows that both parties believed the Partnership Agreement to be binding. The best evidence of this can be found in the parties' discussions about the "settlement agreement," in which the parties contemplated "replac[ing] the *existing* [P]artnership [A]greement."[80]

---

[78] JX 6.

[79] JX 8 at 8, 12–13.

[80] *See, e.g.*, JX 11 at 1 (emphasis added). *See Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *21 (Del. Ch. June 30, 2023) ("[A] court may consider a reneging party's post-signing conduct if it reflects an objective manifestation of the reneging party's intent to be bound by the agreement."); *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *24 n.264 (Del. Ch. Dec. 8, 2017) ("'The parties' actions following the deal are also informative' in determining whether they mutual[ly] assented to be bound." (quoting *Trexler v. Billingsley*, 2017 WL 2665059, at *4 (Del. 2017) (TABLE))); *see also* Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); 17A C.J.S. *Contracts* § 444 ("A party's conduct may be evidence of its intent . . . so long as that conduct evinces an interpretation contrary to that party's interest.").

The Partnership Agreement, whose title is seemingly the result of an imprecise translation from Hebrew to English,[81] served the role of an operating agreement. Indeed, "Delaware's LLC Act defines a limited liability company agreement as '*any agreement* (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business.'" *Klein v. Sussman*, 2024 WL 339339, at *7 (Del. Ch. Jan. 30, 2024) (emphasis added) (quoting 6 *Del. C.* § 18-101(9)).

The Partnership Agreement defines the "Partnership" to mean "SBTN Holdings, LLC," "a limited corporation (LLC) in Delaware, USA," and purports to govern "the contractual relationship between [the parties] in connection with the partnership, the realization of the purpose of the partnership, [and] the management of the partnership and its assets."[82] Consistent with the stated purpose of governing SBTN Holdings' internal management, the Partnership Agreement designates the General Partners as Vertice and SBTN Venture, LLC (controlled by Alakarka),[83] and in Section 4, establishes the Member Partner's (*i.e.*, O.R.C.'s) capital

---

[81] The Partnership Agreement defines "SBTN Holdings[,] LLC" as "the Partnership." Partnership Agt. at 3.

[82] *Id.*

[83] *Id.* at 5.

contributions in exchange for an 80% membership interest.[84]  Section 6 governs

SBTN Holdings' expenses and distribution of profits, and Section 7 (entitled

"Managing the Partnership") governs decision-making within SBTN Holdings,

including by setting voting requirements for "any material economic matter . . . that

exceeds the normal course of business."[85]  Section 8 governs dissolution of SBTN

Holdings, while Section 9 sets limitations on the transfer of membership interests.[86]

These provisions govern "the affairs of [SBTN Holdings] and the conduct of its

business."  6 *Del. C.* § 18-101(9).

Thus, the Partnership Agreement, and not the Purported Operating

Agreement, governed (and for the reasons explained below, continues to govern) the

parties' interests in SBTN Holdings.

### b. The Parties Did Not Rescind The Partnership Agreement.

In August 2018, a dispute arose between the parties, resulting in an agreement

that Levy would leave SBTN Holdings.[87]  The parties agreed to "replace the existing

[P]artnership [A]greement, by means of an appendix that cancels it and refers to an

---

[84] *Id.* § 4.

[85] *Id.* §§ 6–7.

[86] *Id.* §§ 8–9.

[87] *See* pp. 8–10, *supra*.

operating agreement with a different premium model."[88]  Although the record

demonstrates that the parties attempted to negotiate a new operating agreement to

replace the Partnership Agreement, they never reached agreement on the 2018 Draft

Operating Agreement.  The parties' inability to come to terms on a new agreement

meant the Partnership Agreement remained in place.

Defendant argues that despite the parties' failure to execute a new operating

agreement, the parties nonetheless acted in accordance with the "settlement

agreement" under which they agreed to "cancel" the Partnership Agreement.[89]  That

is true, but the parties also agreed to "replace" the Partnership Agreement with a new

operating agreement.[90]  Nothing in the record suggests the parties canceled the

Partnership Agreement before reaching a new agreement.  Indeed, though the parties

also negotiated a "cancellation document" in connection with the 2018 Draft

Operating Agreement, they did not sign that document either.[91]

Finally, Defendant argues that O.R.C.'s investment became a "loan" when it

accepted "repayment" from the proceeds of the refinancing.  However, the evidence

shows that O.R.C. never agreed to transform its capital contribution into a loan, and

---

[88] JX 11 at 1.

[89] *See* AB at 11–12, 18.

[90] JX 11 at 1.

[91] *See* JX 13 at 1–2; JX 15 at 6–7; JX 20.  There is no evidence of a signed cancellation document in the record.

instead accepted the funds as a distribution. Defendant argues that O.R.C. acquiesced to a repayment by delivering materials to the lender referencing a "return of funds."[92] But nothing in the record suggests that either party—SBTN Holdings or O.R.C.—ever viewed O.R.C. as a "creditor" or "lender." The parties' course of dealing reflects the opposite: O.R.C. received K-1s as a member;[93] SBTN Holdings repeatedly held out O.R.C. as a member in its organizational charts;[94] and O.R.C. paid management fees to SBTN Holdings as a member.[95]

Accordingly, the Partnership Agreement controls, and under its terms, O.R.C. is an 80% member. Because Defendant contests the Demand solely on the basis that O.R.C. is not a member of SBTN Holdings, judgment is entered for Plaintiff.

## B. Plaintiff's Request For Attorneys' Fees Is Denied.

Plaintiff seeks an award of attorneys' fees incurred in litigating this action. "Delaware courts follow the American Rule that 'each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation.'" *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *29 (Del. Ch. Nov. 24, 2020) (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)). An exception exists in equity,

---

[92] *See* JX 48 at 1; JX 49 at 1; AB at 29–30.

[93] JX 11 at 2; JX 24 at 1; JX 35 at 2; JX 36 at 2; JX 47 at 2; JX 52 at 2; JX 55 at 2. By contrast, the record does not include any K-1s issued to the Trachtingot family members.

[94] JX 9 at 5; JX 33 at 4.

[95] JX 10 at 1.

28

however, when a party litigates in bad faith. *Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004). This Court has recognized that in "extraordinary circumstances," "overly aggressive litigation strategies" employed to improperly resist a books and records demand may warrant fee-shifting. *Pettry*, 2020 WL 6870461, at *29–30 (citation omitted). A party seeking to shift fees must satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad faith." *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)). To warrant fees, a litigant's conduct must be "glaringly egregious." *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023).

Plaintiff has failed to meet the high bar to demonstrate clear evidence of bad faith warranting fee-shifting. To support its claim, Plaintiff merely asserts that "Defendant refused and required O.R.C. to (a) commence a books and records action; (b) refute Defendant's argument that it is not a member of SBTN Holdings, (c) engage in thorough discovery, and (d) try this case."[96]

In my view, Defendant's decision to litigate this case does not, in itself, meet the high bar to demonstrate "glaringly egregious" conduct. "[W]inning on the merits does not automatically entitle a Section [18-305] plaintiff to fees; again, fee shifting

---

[96] OB at 30.

is appropriate in the *rare* event that a party has litigated vexatiously or otherwise acted in subjective *bad faith*." *Hashemi v. All.Health, Inc.*, 2024 WL 1500659, at *3 (Del. Ch. Apr. 8, 2024); *see also Gen. Video Corp. v. Kertesz*, 2009 WL 106509, at *1 (Del. Ch. Jan. 13, 2009) (noting "the simple fact that" a party's positions "were disproven at trial is not itself clear evidence of bad faith").

The Court's finding with respect to the Purported Operating Agreement likewise does not support an award of fees. The Court has concluded based on the record evidence that the Purported Operating Agreement does not govern the parties' relationship or SBTN Holdings' internal affairs, but it has stopped short of finding fraud or bad faith. Because Defendant's litigation positions do not reflect an "abuse of process that is manifestly incompatible with justice" or "an attempt to game the system" in bad faith,[97] Plaintiff's request for an award of attorneys' fees is denied.

## III. CONCLUSION

For the reasons explained above, judgment is entered for Plaintiff.

---

[97] *Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019).